## BABBITT, GOVERNOR OF ARIZONA, ET AL. *v.* UNITED FARM WORKERS NATIONAL UNION ET AL.

No. 78–225.   Argued February 21, 1979—Decided June 5, 1979

290

WHITE, J., delivered the opinion for the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, *post*, p. 314.

*Rex E. Lee,* Special Assistant Attorney General of Arizona, argued the cause for appellants. With him on the briefs were *Robert Corbin,* Attorney General, *John A. LaSota, Jr.,* former Attorney General, *Charles E. Jones, Jon L. Kyl,* and *John B. Weldon, Jr.*

*Jerome Cohen* argued the cause for appellees. With him on the brief was *James Rutkowski.**

MR. JUSTICE WHITE delivered the opinion of the Court.

In this case we review the decision of a three-judge District Court setting aside as unconstitutional Arizona's farm labor statute. The District Court perceived particular constitutional problems with five provisions of the Act; deeming these provisions inseparable from the remainder of the Act, the court declared the entire Act unconstitutional and enjoined its enforcement. We conclude that the challenges to two of the provisions specifically invalidated did not present a case or controversy within the jurisdiction of a federal court and hence should not have been adjudicated. Although the attacks on two other provisions were justiciable, we conclude that the District Court should have abstained from deciding the federal issues posed until material, unresolved questions of state law were determined by the Arizona courts. Finally, we believe that the District Court properly reached the merits of the fifth provision but erred in invalidating it. Acordingly, we reverse the judgment of the District Court.

I

In 1972, the Arizona Legislature enacted a comprehensive scheme for the regulation of agricultural employment relations. Arizona Agricultural Employment Relations Act, Ariz. Rev. Stat. Ann. §§ 23–1381 to 23–1395 (Supp. 1978). The

---

*\*Joseph Herman* filed a brief for the Agricultural Producers Labor Committee et al. as *amici curiaè* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Mark D. Rosenbaum, Fred Okrand,* and *Dennis M. Perluss* for the American Civil Liberties Union Foundation of Southern California et al.; and by *J. Albert Woll* and *Laurence Gold* for the American Federation of Labor and Congress of Industrial Organizations.

*Marvin J. Brenner* and *Ellen Lake* filed a brief for the Agricultural Labor Relations Board as *amicus curiae.*

statute designates procedures governing the election of employee bargaining representatives, establishes various rights of agricultural employers and employees, proscribes a range of employer and union practices, and establishes a civil and criminal enforcement scheme to ensure compliance with the substantive provisions of the Act.

Appellees—the United Farm Workers National Union (UFW), an agent of the UFW, named farmworkers, and a supporter of the UFW—commenced suit in federal court to secure a declaration of the unconstitutionality of various sections of the Act, as well as of the entire Act, and an injunction against its enforcement.[1] A three-judge District Court was convened to entertain the action. On the basis of past instances of enforcement of the Act and in light of the provision for imposition of criminal penalties for "violat[ion of] any provision" of the Act, Ariz. Rev. Stat. Ann. § 23–1392 (Supp. 1978), the court determined that appellees' challenges were presently justiciable.[2] Reaching the merits of some of the

---

[1] The complaint asserted that the Act as a whole was invalid because it was pre-empted by the federal labor statutes, imposed an impermissible burden on commerce, denied appellees equal protection, and amounted to a bill of attainder. In addition, various constitutional challenges were made to one or more parts of 15 provisions of the Act.

[2] The District Court did not analyze section by section why a case or controversy existed with respect to each of the challenged sections. Rather, from instances of private and official enforcement detailed in a stipulation filed by the parties, the court concluded that the case was not "hypothetical, abstract, or generalized." 449 F. Supp. 449, 452 (Ariz. 1978). It did, however, focus specifically on § 23–1392. That provision makes it a crime to violate any other provision of the Act; and although the District Court deemed this section severable from the rest of the Act, it relied heavily on its conclusion that it had jurisdiction to adjudicate the validity of this section to justify its considering the constitutionality of other sections of the Act. See 449 F. Supp., at 454. In proceeding to do so, it ruled that evidence would be considered only in connection with § 23–1389 dealing with the election of bargaining representatives and with respect to § 23–1385 (C) limiting union access to employer properties, although evidence was introduced at trial relative to other provisions.

claims, the court ruled unconstitutional five distinct provisions of the Act.[3]  Specifically, the court disapproved the section specifying election procedures, § 23–1389,[4] on the ground that, by failing to account for seasonal employment peaks, it precluded the consummation of elections before most workers dispersed and hence frustrated the associational rights of agricultural employees.  The court was also of the view that the Act restricted unduly the class of employees technically eligible to vote for bargaining representatives and hence burdened the workers' freedom of association in this second respect.[5]

---

[3] The court did not explain the basis for selecting from all of the challenges presented the five provisions on which it passed judgment.

[4] Section 23–1389 declares that representatives selected by a secret ballot for the purpose of collective bargaining by the majority of agricultural employees in an appropriate bargaining unit shall be the exclusive representatives of all agricultural employees in such unit for the purpose of collective bargaining.  And it requires the Agricultural Employment Relations Board to ascertain the unit appropriate for purposes of collective bargaining.  The section further provides that the Board shall investigate any petition alleging facts specified in § 23–1389 indicating that a question of representation exists and schedule an appropriate hearing when the Board has reasonable cause to believe that a question of representation does exist.  If the hearing establishes that such a question exists, the Board is directed to order an election by secret ballot and to certify the results thereof.  Section 23–1389 details the manner in which an election is to be conducted.  The section further provides for procedures by which an employer might challenge a petition for an election.  Additionally, § 23–1389 stipulates that no election shall be directed or conducted in any unit within which a valid election has been held in the preceding 12 months.

Section 23–1389 also sets down certain eligibility requirements regarding participation in elections conducted thereunder.  And it imposes obligations on employers to furnish information to the Board, to be made available to interested unions and employees, concerning bargaining-unit employees qualified to vote.  Finally, the section specifies procedures whereby agricultural employees may seek to rescind the representation authority of a union currently representing those employees.

[5] The election provision contemplates voting by "agricultural employees,"

The court, moreover, ruled violative of the First and Fourteenth Amendments the provision limiting union publicity directed at consumers of agricultural products, § 23–1385 (B)(8),[6] because as it construed the section, it proscribed innocent as well as deliberately false representations. The same section was declared infirm for the additional reason that it prohibited any consumer publicity, whether true or false, implicating a product trade name that "may include" agricultural products of an employer other than the employer with whom the protesting labor organization is engaged in a primary dispute.

The court also struck down the statute's criminal penalty provision, § 23–1392,[7] on vagueness grounds, and held unconstitutional the provision excusing the employer from furnishing to a labor organization any materials, information, time, or facilities to enable the union to communicate with the

§ 23–1389 (A), which is defined in § 23–1382 (1) so as to exclude workers having only a brief history of employment with an agricultural employer.

[6] Section 23–1385 (B)(8) makes it an unfair labor practice for a labor organization or its agents:

"To induce or encourage the ultimate consumer of any agricultural product to refrain from purchasing, consuming or using such agricultural product by the use of dishonest, untruthful and deceptive publicity. Permissible inducement or encouragement within the meaning of this section means truthful, honest and nondeceptive publicity which identifies the agricultural product produced by an agricultural employer with whom the labor organization has a primary dispute. Permissible inducement or encouragement does not include publicity directed against any trademark, trade name or generic name which may include agricultural products of another producer or user of such trademark, trade name or generic name."

[7] Section 23–1392 provides:

"Any person who knowingly resists, prevents, impedes or interferes with any member of the board or any of its agents or agencies in the performance of duties pursuant to this article, or who violates any provision of this article is guilty of a class 1 misdemeanor. The provisions of this section shall not apply to any activities carried on outside the state of Arizona."

employer's employees. § 23–1385 (C).[8] The court thought that the latter provision permitted employers to prevent access by unions to migratory farmworkers residing on their property, in violation of the guarantees of free speech and association.

Finally, the court disapproved a provision construed as mandating compulsory arbitration, § 23–1393 (B),[9] on the ground that it denied employees due process and the right to a jury trial, which the District Court found guaranteed by the Seventh Amendment. The remainder of the Act fell "by

---

[8] Section 23–1385 (C) provides in part:

"No employer shall be required to furnish or make available to a labor organization, and no labor organization shall be required to furnish or make available to an employer, materials, information, time, or facilities to enable such employer or labor organization, as the case may be, to communicate with employees of the employer, members of the labor organization, its supporters, or adherents."

[9] Section 23–1393 (B) provides:

"In the case of a strike or boycott, or threat of a strike or boycott, against an agricultural employer, the court may grant, and upon proper application shall grant as provided in this section, a ten-day restraining order enjoining such a strike or boycott, provided that if an agricultural employer invokes the court's jurisdiction to issue the ten-day restraining order to enjoin a strike as provided by this subsection, said employer must as a condition thereto agree to submit the dispute to binding arbitration as the means of settling the unresolved issues. In the event the parties cannot agree on an arbitrator within two days after the court awards a restraining order, the court shall appoint one to decide the unresolved issues. Any agricultural employer shall be entitled to injunctive relief accorded by Rule 65 of the Arizona Rules of Civil Procedure upon the filing of a verified petition showing that his agricultural employees are unlawfully on strike or are unlawfully conducting a boycott, or are unlawfully threatening to strike or boycott, and that the resulting cessation of work or conduct of a boycott will result in the prevention of production or the loss, spoilage, deterioration, or reduction in grade, quality or marketability of an agricultural commodity or commodities for human consumption in commercial quantities. For the purpose of this subsection, an agricultural commodity or commodities for human consumption with a market value of five thousand dollars or more shall constitute commercial quantities."

reason of its inseparability and inoperability apart from the provisions found to be invalid." 449 F. Supp. 449, 467 (Ariz. 1978).

Appellants sought review by this Court of the judgment below. Because of substantial doubts regarding the justiciability of appellees' claims, we postponed consideration of our jurisdiction to review the merits. 439 U. S. 891 (1978). We now hold that, of the five provisions specifically invalidated by the District Court,[10] only the sections pertaining to election of bargaining representatives, consumer publicity, and imposition of criminal penalties are susceptible of judicial resolution at this time. We further conclude that the District Court should have abstained from adjudicating appellees' challenge to the consumer publicity and criminal penalty provisions, although we think the constitutionality of the election procedures was properly considered even lacking a prior construction by the Arizona courts. We are unable to sustain the District Court's declaration, however, that the election procedures are facially unconstitutional.

## II

We address first the threshold question whether appellees have alleged a case or controversy within the meaning of Art. III of the Constitution or only abstract questions not currently justiciable by a federal court. The difference between an abstract question and a "case or controversy" is one of degree, of course, and is not discernible by any precise test.

---

[10] Appellees challenged numerous provisions before the District Court not expressly considered by that court. After disapproving the five provisions that we address on this appeal, the court concluded that "there is obviously no need to rule on plaintiffs' other contentions including the claimed equal protection violation." 449 F. Supp., at 466. The court then enjoined enforcement of the Act in its entirety, finding the provisions not explicitly invalidated to be inseparable from those actually adjudicated. *Id.*, at 467. We find insufficient reason to consider in this Court in the first instance appellees' challenges to the provisions on which the District Court did not specifically pass judgment.

See *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.*, 312 U. S. 270, 273 (1941). The basic inquiry is whether the "conflicting contentions of the parties . . . present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." *Railway Mail Assn.* v. *Corsi*, 326 U. S. 88, 93 (1945); see *Evers* v. *Dwyer*, 358 U. S. 202, 203 (1958); *Maryland Casualty Co.* v. *Pacific Coal & Oil Co., supra.*

A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement. *O'Shea* v. *Littleton,* 414 U. S. 488, 494 (1974). But "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." *Pennsylvania* v. *West Virginia,* 262 U. S. 553, 593 (1923); see *Regional Rail Reorganization Act Cases,* 419 U. S. 102, 143 (1974); *Pierce* v. *Society of Sisters,* 268 U. S. 510, 526 (1925).

When contesting the constitutionality of a criminal statute, "it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights." *Steffel* v. *Thompson,* 415 U. S. 452, 459 (1974); see *Epperson* v. *Arkansas,* 393 U. S. 97 (1968); *Evers* v. *Dwyer, supra,* at 204. When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe* v. *Bolton,* 410 U. S. 179, 188 (1973). But "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." *Younger* v. *Harris,* 401 U. S. 37, 42 (1971); *Golden* v. *Zwickler,* 394 U. S. 103 (1969). When plaintiffs "do not claim that they have ever

been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible," they do not allege a dispute susceptible to resolution by a federal court. *Younger* v. *Harris, supra,* at 42.

Examining the claims adjudicated by the three-judge court against the foregoing principles, it is our view that the challenges to the provisions regulating election procedures, consumer publicity, and criminal sanctions—but only those challenges—present a case or controversy.[11] As already noted, appellees' principal complaint about the statutory election procedures is that they entail inescapable delays and so preclude conducting an election promptly enough to permit participation by many farmworkers engaged in the production of crops having short seasons. Appellees also assail the assertedly austere limitations on who is eligible to participate in elections under the Act. Appellees admittedly have not invoked the Act's election procedures in the past nor have they expressed any intention of doing so in the future. But, as we see it, appellees' reluctance in this respect does not defeat the justiciability of their challenge in view of the nature of their claim.

Appellees insist that agricultural workers are constitutionally entitled to select representatives to bargain with their employers over employment conditions. As appellees read the statute, only representatives duly elected under its provisions may compel an employer to bargain with them. But

---

[11] Although appellants have contested the justiciability of appellees' several challenges to the Act's provisions, they have not contended that the standing of any particular appellee is more dubious than the standing of any other. We conclude that at least the UFW has a "sufficient 'personal stake' in a determination of the constitutional validity of [the three aforementioned provisions] to present 'a real and substantial controversy admitting of specific relief through a decree of a conclusive character.'" *Buckley* v. *Valeo,* 424 U. S. 1, 12 (1976) (footnote omitted), quoting *Aetna Life Ins. Co.* v. *Haworth,* 300 U. S. 227, 241 (1937). See *NAACP* v. *Alabama,* 357 U. S. 449, 458 (1958). Accordingly, we do not assess the standing of the remaining appellees. See *Buckley* v. *Valeo, supra,* at 12.

appellees maintain, and have adduced evidence tending to prove, that the statutory election procedures frustrate rather than facilitate democratic selection of bargaining representatives. And the UFW has declined to pursue those procedures, not for lack of interest in representing Arizona farmworkers in negotiations with employers, but due to the procedures' asserted futility. Indeed, the UFW has in the past sought to represent Arizona farmworkers and has asserted in its complaint a desire to organize such workers and to represent them in collective bargaining. Moreover, the UFW has participated in nearly 400 elections in California under procedures thought to be amenable to prompt and fair elections. The lack of a comparable opportunity in Arizona is said to impose a continuing burden on appellees' associational rights.

Even though a challenged statute is sure to work the injury alleged, however, adjudication might be postponed until "a better factual record might be available." *Regional Rail Reorganization Act Cases, supra,* at 143. Thus, appellants urge that we should decline to entertain appellees' challenge until they undertake to invoke the Act's election procedures. In that way, the Court might acquire information regarding how the challenged procedures actually operate, in lieu of the predictive evidence that appellees introduced at trial.[12] We

---

[12] Though waiting until appellees invoke unsuccessfully the statutory election procedures would remove any doubt about the existence of concrete injury resulting from application of the election provision, little could be done to remedy the injury incurred in the particular election. Challengers to election procedures often have been left without a remedy in regard to the most immediate election because the election is too far underway or actually consummated prior to judgment. See, *e. g., Dunn* v. *Blumstein,* 405 U. S. 330, 333 n. 2 (1972); *Moore* v. *Ogilvie,* 394 U. S. 814, 816 (1969); *Williams* v. *Rhodes,* 393 U. S. 23, 34–35 (1968). Justiciability in such cases depends not so much on the fact of past injury but on the prospect of its occurrence in an impending or future election. See, *e. g., Storer* v. *Brown,* 415 U. S. 724, 737 n. 8 (1974); *Rosario* v. *Rockefeller,* 410 U. S. 752, 756 n. 5 (1973); *Dunn* v. *Blumstein, supra,* at 333 n. 2. There is value in adjudicating election challenges notwithstanding

are persuaded, however, that awaiting appellees' participation in an election would not assist our resolution of the threshold question whether the election procedures are subject to scrutiny under the First Amendment at all. As we regard that question dispositive to appellees' challenge—as elaborated below—we think there is no warrant for postponing adjudication of the election claim.

Appellees' twofold attack on the Act's limitation on consumer publicity is also justiciable now. Section 23–1385 (B) (8) makes it an unfair labor practice "[t]o induce or encourage the ultimate consumer of any agricultural product to refrain from purchasing, consuming or using such agricultural product by the use of dishonest, untruthful and deceptive publicity." And violations of that section may be criminally punishable. § 23–1392. Appellees maintain that the consumer publicity provision unconstitutionally penalizes inaccuracies inadvertently uttered in the course of consumer appeals.

The record shows that the UFW has actively engaged in consumer publicity campaigns in the past in Arizona, and appellees have alleged in their complaint an intention to continue to engage in boycott activities in that State. Although appellees do not plan to propagate untruths, they contend—as we have observed—that "erroneous statement is inevitable in free debate." *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 271 (1964). They submit that to avoid criminal prosecution they must curtail their consumer appeals, and thus forgo full exercise of what they insist are their First Amendment rights. It is urged, accordingly, that their challenge to the limitation on consumer publicity plainly poses an actual case or controversy.

---

the lapse of a particular election because "[t]he construction of the statute, an understanding of its operation, and possible constitutional limits on its application, will have the effect of simplifying future challenges, thus increasing the likelihood that timely filed cases can be adjudicated *before* an election is held." *Storer* v. *Brown, supra*, at 737 n. 8 (emphasis added).

Appellants maintain that the criminal penalty provision has not yet been applied and may never be applied to commissions of unfair labor practices, including forbidden consumer publicity. But, as we have noted, when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need not "first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute." *Steffel* v. *Thompson,* 415 U. S., at 459. The consumer publicity provision on its face proscribes dishonest, untruthful, and deceptive publicity, and the criminal penalty provision applies in terms to "[a]ny person . . . who violates any provision" of the Act. Moreover, the State has not disavowed any intention of invoking the criminal penalty provision against unions that commit unfair labor practices. Appellees are thus not without some reason in fearing prosecution for violation of the ban on specified forms of consumer publicity.[13] In our view, the positions of the parties are sufficiently adverse with respect to the consumer publicity provision proscribing misrepresentations to present a case or controversy within the jurisdiction of the District Court.

Section 23-1385 (B)(8) also is said to limit consumer appeals to those directed at products with whom the labor organization involved has a primary dispute; as appellees construe it, it *proscribes* "publicity directed against any trademark, trade name or generic name which may include agricultural products of another producer or user of such trademark, trade name or generic name" Appellees challenge that limitation as unduly restricting protected speech. Ap-

---

[13] Even independently of criminal sanctions, § 23-1385 (B)(8) affirmatively prohibits the variety of consumer publicity specified therein. We think that the prospect of issuance of an administrative cease-and-desist order, § 23-1390 (C), or a court-ordered injunction, §§ 23-1390 (E), (J), (K), against such prohibited conduct provides substantial additional support for the conclusion that appellees' challenge to the publicity provision is justiciable.

pellees have in the past engaged in appeals now arguably prohibited by the statute and allege an intention to continue to do the same. For the reasons that appellees' challenge to the first aspect of the consumer publicity provision is justiciable, we think their claim directed against the second aspect may now be entertained as well.

We further conclude that the attack on the criminal penalty provision, itself, is also subject to adjudication at this time. Section 23–1392 authorizes imposition of criminal sanctions against "[a]ny person . . . who violates any provision" of the Act. Appellees contend that the penalty provision is unconstitutionally vague in that it does not give notice of what conduct is made criminal. Appellees aver that they have previously engaged, and will in the future engage, in organizing, boycotting, picketing, striking, and collective-bargaining activities regulated by various provisions of the Act.[14] They assert that they cannot be sure whether criminal sanctions may be visited upon them for pursuing any such conduct, much of which is allegedly constitutionally protected. As we have noted, it is clear that appellees desire to engage at least in consumer publicity campaigns prohibited by the Act; accordingly, we think their challenge to the precision of the criminal penalty provision, itself, was properly entertained by the District Court and may be raised here on appeal. If the provision were truly vague, appellees should not be expected to pursue their collective activities at their peril.

Appellees' challenge to the access provision, however, is not justiciable. The provision, § 23–1385 (C), stipulates that "[n]o employer shall be required to furnish or make available to a labor organization . . . information, time, or facilities to enable such . . . labor organization . . . to communicate with

---

[14] *E. g.*, § 23–1385 (C) (access to employer's property); § 23–1385 (B) (7) (boycotts); § 23–1385 (B) (12) (picketing and boycotts); § 23–1385 (B) (13) (striking by minorities); §§ 23–1384, 23–1385 (D) (collective bargaining).

employees of the employer, members of the labor organization, its supporters, or adherents." Appellees insist, and the District Court held, that this provision deprives the Arizona Employment Relations Board—charged with responsibility for enforcing the Act—of any discretion to compel agricultural employers to furnish materials, information, time, or facilities to labor organizations desirous of communicating with workers located on the employers' property and that the section for this reason violates the First and Fourteenth Amendments to the Constitution.

It may be accepted that the UFW will inevitably seek access to employers' property in order to organize or simply to communicate with farmworkers. But it is conjectural to anticipate that access will be denied. More importantly, appellees' claim depends inextricably upon the attributes of the situs involved. They liken farm labor camps to the company town involved in *Marsh* v. *Alabama,* 326 U. S. 501 (1946), in which the First Amendment was held to operate. Yet it is impossible to know whether access will be denied to places fitting appellees' constitutional claim. We can only hypothesize that such an event will come to pass, and it is only on this basis that the constitutional claim could be adjudicated at this time. An opinion now would be patently advisory; the adjudication of appellees' challenge to the access provision must therefore await at least such time as appellees can assert an interest in seeking access to particular facilities as well as a palpable basis for believing that access will be refused.

Finally, the constitutionality of the allegedly compulsory arbitration provision was also improperly considered by the District Court. That provision specifies that an employer may seek and obtain an injunction "upon the filing of a verified petition showing that his agricultural employees are unlawfully on strike or are unlawfully conducting a boycott, or are unlawfully threatening to strike or boycott, and that the

resulting cessation of work or conduct of a boycott will result in the prevention of production or the loss, spoilage, deterioration, or reduction in grade, quality or marketability of an agricultural commodity or commodities for human consumption in commercial quantities." § 23–1393 (B). If an employer invokes a court's jurisdiction to issue a temporary restraining order to enjoin a *strike,* the employer "must as a condition thereto agree to submit the dispute to binding arbitration as the means of settling the unresolved issues." And if the parties cannot agree on an arbitrator, the court must appoint one.

On the record before us, there is an insufficiently real and concrete dispute with respect to application of this provision. Appellees themselves acknowledge that, assuming an arguably unlawful strike will occur, employers may elect to pursue a range of responses other than seeking an injunction and agreeing to arbitrate. Moreover, appellees have never contested the constitutionality of the arbitration clause. They declare that "[t]he three judge court below on its own motion found the binding arbitration provision of § 1393 (B) violative of substantive due process and the Seventh Amendment." Brief for Appellees 71 n. 153. Appellees, instead, raised other challenges to the statute's civil enforcement scheme, which we do not consider on this appeal. See n. 10, *supra.* It is clear, then, that any ruling on the compulsory arbitration provision would be wholly advisory.

## III

Appellants contend that, even assuming any of appellees' claims are justiciable, the District Court should have abstained from adjudicating those claims until the Arizona courts might authoritatively construe the provisions at issue. We disagree that appellees' challenge to the statutory election procedures should first be submitted to the Arizona courts, but we think that the District Court should have abstained from considering the constitutionality of the criminal

penalty provision and the consumer publicity provision pending review by the state courts.

As we have observed, " '[a]bstention . . . sanctions . . . escape [from immediate decision] only in narrowly limited "special circumstances." ' " *Kusper* v. *Pontikes,* 414 U. S. 51, 54 (1973), quoting *Lake Carriers' Assn.* v. *MacMullan,* 406 U. S. 498, 509 (1972). "The paradigm of the 'special circumstances' that make abstention appropriate is a case where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question." *Kusper* v. *Pontikes, supra,* at 54; see *Zwickler* v. *Koota,* 389 U. S. 241, 249 (1967); *Harrison* v. *NAACP,* 360 U. S. 167, 176–177 (1959); *Railroad Comm'n* v. *Pullman Co.,* 312 U. S. 496 (1941). Of course, the abstention doctrine "contemplates that deference to state court adjudication only be made where the issue of state law is uncertain." *Harman* v. *Forssenius,* 380 U. S. 528, 534 (1965). But when the state statute at issue is "fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question," *id.,* at 535, abstention may be required "in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication," *id.,* at 534.

We think that a state-court construction of the provision governing election procedures would not obviate the need for decision of the constitutional issue or materially alter the question to be decided. As we shall discuss, our resolution of the question whether the statutory election procedures are affected with a First Amendment interest at all is dispositive of appellees' challenge. And insofar as it bears on that matter, the statute is pointedly clear. Accordingly, we perceive no basis for declining to decide appellees' challenge to the election procedures, notwithstanding the absence of a prior state-court adjudication.

We conclude, however, that the District Court should have postponed resolution of appellees' challenge to the criminal penalty provision. That section provides in pertinent part that "[a]ny person . . . who violates any provision of [the Act] is guilty of a . . . misdemeanor." § 23–1392. Appellees maintain that the penalty provision leaves substantial doubt regarding what activities will elicit criminal sanctions. The District Court so concluded, observing that "[c]onsidering the enormous variety of activities covered by the Act, [the penalty section] is clearly a statutory provision so vague that men of common intelligence can only guess at its meaning." 449 F. Supp., at 453. The court elaborated: "There is no way for anyone to guess whether criminal provisions will apply to any particular conduct, in advance, and it is clear that the statute is unconstitutionally vague and does not adequately define prohibited conduct and is, therefore, in violation of the due process clause of the Fourteenth Amendment." *Ibid.*

Appellants, themselves, do not argue that the criminal penalty provision is unambiguous. Indeed, they insist that until the provision is enforced "it is impossible to know what will be considered a 'violatio[n]' of the Act." Brief for Appellants 37. Appellants submit that various unfair labor practices, for example, have not been treated as yet as criminal violations.

It is possible, however, that the penalty provision might be construed broadly as applying to all sections of the Act that affirmatively proscribe or command courses of conduct. In terms it reaches "[a]ny person . . . who violates any provision of" the Act. Alternatively, the Arizona courts might conclude that only limited portions of the Act are susceptible of being "violated" and thus narrowly define the reach of the penalty section. In either case, it is evident that the statute is reasonably susceptible of constructions that might undercut or modify appellees' vagueness attack. It may be that, if construed broadly, the penalty provision

would operate in conjunction with substantive provisions of the Act to restrict unduly the pursuit of First Amendment activities. But it is at least evident that an authoritative construction of the penalty provision may significantly alter the constitutional questions requiring resolution.[15]

We have noted, of course, that when "extensive adjudications, under the impact of a variety of factual situations, [would be required in order to bring a challenged statute] within the bounds of permissible constitutional certainty," abstention may be inappropriate. *Baggett* v. *Bullitt,* 377 U. S. 360, 378 (1964). But here the Arizona courts may determine in a single proceeding what substantive provisions the penalty provision modifies. In this case, the "uncertain issue of state law [turns] upon a choice between one or several alternative meanings of [the] state statute." *Ibid.* Accordingly, we think the Arizona courts should be "afforded a reasonable opportunity to pass upon" the section under review. *Harrison* v. *NAACP, supra,* at 176.

The District Court should have abstained with respect to appellees' challenges to the consumer publicity provision as well. Appellees have argued that Arizona's proscription of misrepresentations by labor organizations in the course of appeals to consumers intolerably inhibits the exercise of their

---

[15] The dissent suggests that § 23–1392 is unambiguous and needs no construction and that abstention is therefore improper. But the District Court invalidated § 23–1392 on vagueness grounds, and the State's position with respect to the issue is such that we are reluctant to conclude that appellees' challenge to § 23–1392 on vagueness grounds is without substance and hence that it contains no ambiguity warranting abstention.

If there were to be no abstention regarding § 23–1392 on the basis that it clearly criminalizes any departure from the command of any provision of the Act, adequate consideration of whether the section is unconstitutionally overbroad would require inquiry into whether some conduct prohibited by the Act is constitutionally shielded from criminal punishment. But that would entail dealing with the validity of provisions about which there may be no case or controversy or with respect to which abstention is the proper course.

First Amendment right freely to discuss issues concerning the employment of farm laborers and the production of crops. Appellants submit, however, that the statutory ban on untruthful consumer publicity might fairly be construed by an Arizona court as proscribing only misrepresentations made with knowledge of their falsity or in reckless disregard of truth or falsity. As that is the qualification that appellees insist the prohibition of misstatements must include, a construction to that effect would substantially affect the constitutional question presented.

It is reasonably arguable that the consumer publicity provision is susceptible of the construction appellants suggest. Section 23–1385 (B)(8) makes it unlawful "[t]o induce or encourage the ultimate consumer of any agricultural product to refrain from purchasing, consuming or using such agricultural product by use of dishonest, untruthful *and* deceptive publicity." (Emphasis added.) On its face, the statute does not forbid the propagation of untruths without more. Rather, to be condemnable, consumer publicity must be "dishonest" and "deceptive" as well as untruthful. And the Arizona courts may well conclude that a "dishonest" and "untruthful" statement is one made with knowledge of falsity or in reckless disregard of falsity.[16]

---

[16] Although construing the section in this manner would apparently satisfy appellees, we should not be understood as declaring that the section and its criminal sanction would be unconstitutional if they proscribed damaging falsehoods perpetrated unknowingly or without recklessness. We have not adjudicated the role of the First Amendment in suits by private parties against nonmedia defendants, nor have we considered the constitutional implications of causes of action for injurious falsehoods outside the area of defamation and the ground covered by *Time, Inc.* v. *Hill,* 385 U. S. 374 (1967). *Linn* v. *Plant Guard Workers,* 383 U. S. 53 (1966), holding that application of state defamation remedies for speech uttered in a labor dispute is dependent upon a showing of knowledge or recklessness, was grounded in federal labor policy, though the case had constitutional overtones.

Furthermore, we express no view on whether the section would be

To be sure, the consumer publicity provision further provides that "[p]ermissible inducement or encouragement . . . means truthful, honest *and* nondeceptive publicity. . . ." (Emphasis added.) That phrase may be read to indicate that representations not having all three attributes are prohibited under the Act. But it could be held that the phrase denotes only that "truthful, honest and nondeceptive publicity" is permissible, not that any other publicity is prohibited. When read in conjunction with the prohibitory clause preceding it, the latter phrase thus introduces an ambiguity suitable for state-court resolution. In sum, we think adjudication of appellees' attack on the statutory limitation on untruthful consumer appeals should await an authoritative interpretation of that limitation by the Arizona courts.

We further conclude that the District Court should have abstained from adjudicating appellees' additional contention that the consumer publicity provision unconstitutionally precludes publicity not directed at the products of employers with whom the protesting labor organization has a primary dispute. We think it is by no means clear that the statute in fact *prohibits* publicity solely because it is directed at the products of particular employers. As already discussed, § 23-1385 (B)(8) declares it an unfair labor practice to induce or encourage the ultimate consumer of agricultural products to refrain from purchasing products "by the use of dishonest, untruthful and deceptive publicity." The provision then stipulates:

> "Permissible inducement or encouragement within the meaning of this section means truthful, honest and nondeceptive publicity which identifies the agricultural prod-

---

vulnerable to constitutional attack if it declared false consumer publicity, whether innocent or culpable, to be an unfair labor practice and had as its only sanction a prospective cease-and-desist order or court injunction directing that the defendant cease publishing material already determined to be false.

uct produced by an agricultural employer with whom the labor organization has a primary dispute. Permissible inducement or encouragement does not include publicity directed against any trademark, trade name or generic name which may include agricultural products of another producer or user of such trademark, trade name or generic name."

The section nowhere proscribes publicity directed at products of employers with whom a labor organization is not engaged in a primary dispute. It indicates only that publicity ranging beyond a primary disagreement is not¡ accorded affirmative statutory protection  The Arizona courts might reasonably determine that the language in issue does no more than that and might thus ameliorate appellees' concerns.[17]

Moreover, § 23–1385 (B)(8) might be construed, in light of § 23–1385 (C), to prohibit only threatening speech. The latter provision states in pertinent part that "[t]he expressing of any views, argument, opinion or the making of any statement . . . or the dissemination of such views whether in written, printed, graphic, visual or auditory form, if such expression contains no threat of reprisal or force or promise of benefit, shall not constitute or be evidence of an unfair

---

[17] Were the section construed to prohibit all appeals directed against the products of agricultural employers whose employees the labor organization did not actually represent, its constitutionality would be substantially in doubt. Even picketing may not be so narrowly circumscribed. *AFL* v. *Swing,* 312 U. S. 321 (1941). Additional difficulties would arise were the section interpreted to intercept publicity by means other than picketing. Although we have previously concluded that picketing aimed at discouraging trade across the board with a truly neutral employer may be barred compatibly with the Constitution, *Carpenters* v. *Ritter's Cafe,* 315 U. S. 722 (1942); cf. *NLRB* v. *Fruit Packers,* 377 U. S. 58 (1964), we have noted that, for First Amendment purposes, picketing is qualitatively "different from other modes of communication." *Hughes* v. *Superior Court,* 339 U. S. 460, 465 (1950); see *Buckley* v. *Valeo,* 424 U. S., at 17; *Teamsters* v. *Vogt, Inc.,* 354 U. S. 284 (1957).

labor practice . . . ." On its face, § 23–1385 (C) would appear to qualify § 23–1385 (B) (8), as the latter identifies "an unfair labor practice for a labor organization or its agents." Were the consumer publicity provision interpreted to intercept only those expressions embodying a threat of force, the issue of its constitutional validity would assume a character wholly different from the question posed by appellees' construction.

Thus, we conclude that the District Court erred in entertaining all aspects of appellees' challenge to the consumer publicity section without the benefit of a construction thereof by the Arizona courts. We are sensitive to appellees' reluctance to repair to the Arizona courts after extensive litigation in the federal arena. We nevertheless hold that in this case the District Court should not have adjudicated substantial constitutional claims with respect to statutory provisions that are patently ambiguous on their face.[18]

## IV

The merits of appellees' challenge to the statutory election procedures remain to be considered. Appellees contend, and the District Court concluded, that the delays assertedly attending the statutory election scheme and the technical limitations on who may vote in unit elections severely curtail appellees' freedom of association. This freedom, it is said, entails the liberty not only to join or sustain a labor union and collectively to express a position to an agricultural employer, but also to create or elect an organization entitled to invoke the statutory provision requiring an employer to bargain collectively with the certified representative of his em-

---

[18] It has been suggested that the impact of abstention on appellees' pursuit of constitutionally protected activities should be reduced by directing the District Court to protect appellees against enforcement of the state statute pending a definitive resolution of issues of state law by the Arizona courts. See *Harrison* v. *NAACP,* 360 U. S. 167, 178–179 (1959). But this is a matter that is best addressed by the District Court in the first instance.

ployees. As we see it, however, these general complaints that the statutory election procedures are ineffective are matters for the Arizona Legislature and not the federal courts.

Accepting that the Constitution guarantees workers the right individually or collectively to voice their views to their employers, see *Givhan* v. *Western Line Consolidated School Dist.,* 439 U. S. 410 (1979); cf. *Madison School Dist.* v. *Wisconsin Employment Relations Comm'n,* 429 U. S. 167, 173–175 (1976), the Constitution does not afford such employees the right to compel employers to engage in a dialogue or even to listen. Accordingly, Arizona was not constitutionally obliged to provide a procedure pursuant to which agricultural employees, through a chosen representative, might compel their employers to negotiate. That it has undertaken to do so in an assertedly niggardly fashion, then, presents as a general matter no First Amendment problems.[19] Moreover, the Act does not preclude voluntary recognition of a labor organization by an agricultural employer. Thus, in the event that an employer desires to bargain with a representative chosen by his employees independently of the statutory election procedures, such bargaining may readily occur. The statutory procedures need be pursued only if farmworkers desire to designate exclusive bargaining representatives and to compel their employer to bargain—rights that are conferred by statute rather than the Federal Constitution. Accordingly, at this time, we are unable to discern any First Amendment difficulty with the Arizona statutory

---

[19] We do not consider whether the election procedures deny any of the appellees equal protection of the law. Although appellees have challenged other provisions of the Act on equal protection grounds, they have not directed such an argument in this Court against the section governing election procedures. We understand appellees' equal protection challenge to embrace the sections pertaining to access to an employer's property and consumer publicity. But we have determined that appellees' assault on the first provision is premature and that appellees' attack on the second should be held in abeyance pending resort to the Arizona courts.

election scheme, whether or not the procedures are as fair or efficacious as appellees would like.

*Reversed and remanded.*

MR. JUSTICE BRENNAN with whom MR. JUSTICE MARSHALL joins, concurring in part and dissenting in part.

I join the opinion of the Court, with the exception that I respectfully dissent from the Court's holding that the District Court should have abstained and postponed resolution of appellees' constitutional challenge to § 23–1392, Ariz. Rev. Stat. Ann. (Supp. 1978), until this statutory provision had been construed by the Arizona courts.

It must be stressed that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule. 'The doctrine of abstention . . . is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. . . .' *County of Allegheny* v. *Frank Mashuda Co.,* 360 U. S. 185, 188–189 (1959)." *Colorado River Water Conservation Dist.* v. *United States,* 424 U. S. 800, 813 (1976). If a state statute is susceptible of a construction that would avoid or significantly alter a constitutional issue, however, abstention is appropriate to avoid needless friction "between federal pronouncements and state policies." *Reetz* v. *Bozanich,* 397 U. S. 82, 87 (1970). But, as the Court today correctly points out, the state statute at issue must be " 'fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question,' [*Harman* v. *Forssenius,* 380 U. S. 528,] 535 [1965]." *Ante,* at 306. (Emphasis supplied.) This is not the case with § 23–1392.[1]

Section 23–1392 provides in part:

"Any person who . . . violates any provision of this

---

[1] Because of the ambiguous relationship between § 23–1385 (C) and § 23–1385 (B) (8), I concur in the Court's holding that the District Court should have abstained with respect to § 23–1385 (B) (8).

article is guilty of a . . . misdemeanor. The provisions of this section shall not apply to any activities carried on outside the state of Arizona."

The District Court concluded concerning this provision that "[i]t would appear on [its] face . . . that it cuts across and covers the entire [Arizona Agricultural Employment Relations] Act, not just a limited area where a criminal penalty might be acceptable. It says in plain English that it applies to 'any person' and further [that] any person 'who violates any provision of this article is guilty of a misdemeanor . . . .' " 449 F. Supp. 449, 453 (Ariz. 1978). The District Court found the provision unconstitutionally overbroad.[2] *Ibid.*

The District Court is clearly correct that the language of § 23–1392 is "plain and unambiguous."[3] *Davis* v. *Mann,* 377 U. S. 678, 690 (1964). The statute is not "obviously susceptible of a limiting construction" that would avoid the federal constitutional question reached by the District Court. *Zwickler* v. *Koota,* 389 U. S. 241, 251 n. 14 (1967). Of course, as every attorney knows, *any* statutory provision can be made

---

[2] The District Court also found § 23–1392 to be "unconstitutionally vague." 449 F. Supp., at 453. The Court stated:

"Considering the enormous variety of activities covered by the Act, and the fact that . . . many of these involve First and Fourteenth Amendment constitutional rights, it is clearly a statutory provision so vague that men of common intelligence can only guess at its meaning.

.           .           .           .           .

"There is no way for anyone to guess whether criminal provisions will apply to any particular conduct, in advance, and it is clear that the statute is unconstitutionally vague and does not adequately define prohibited conduct and is, therefore, in violation of the due process clause of the Fourteenth Amendment." *Ibid.*

[3] The fact that § 23–1392 is, for purposes of the abstention doctrine, "plain and unambiguous," does not necessarily mean that it cannot be unconstitutionally vague for purposes of the Due Process Clause of the Fourteenth Amendment. The section may plainly and unambiguously create criminal sanctions for violations of sections of the Act which, considered as criminal prohibitions, would be unconstitutionally vague.

ambiguous through a sufficiently assiduous application of legal discrimination. The Court resorts to such lawyerly leger-demain when it concludes that abstention is appropriate be-cause Arizona courts might perhaps find "that only limited portions of the [Agricultural Employment Relations] Act are susceptible of being 'violated' and thus narrowly define the reach of the penalty section." *Ante,* at 307. But the po-tential ambiguity which the Court thus reads into § 23–1392 does not derive from the plain words of the statute. It is simply the Court's own invention, not an uncertainty that is "fairly" in the statute.[4]

Abstention is particularly inappropriate with respect to § 23–1392 because the provision impacts so directly on precious First Amendment rights. The statute creates sanctions for violations of the provisions of the Agricultural Employment Relations Act that regulate the speech of employees and em-ployers.[5] This potential impairment of First Amendment

---

[4] Even if the statute were ambiguous in the manner suggested by the Court, abstention would still be inappropriate. It is extraordinarily un-likely that, in a statute as complex and far ranging as this Act, a single adjudication could definitively specify the exact reach of § 23–1392. In such circumstances, we have held that a federal court should not abstain from exercising its jurisdiction. As we stated in *Procunier* v. *Martinez,* 416 U. S. 396, 401 n. 5 (1974):

"Where . . . , as in this case, the statute or regulation is challenged as vague because individuals to whom it plainly applies simply cannot under-stand what is required of them and do not wish to forswear all ac-tivity arguably within the scope of the vague terms, abstention is not required. [*Baggett* v. *Bullitt,* 377 U. S. 360,] 378 [1964]. In such a case no single adjudication by a state court could eliminate the constitutional difficulty. Rather it would require 'extensive adjudications, under the impact of a variety of factual situations,' to bring the challenged statute or regulation 'within the bounds of permissible constitutional certainty.' *Ibid.*"

[5] Section 1385 (B) (8), for example, makes it an unfair labor practice "[t]o induce or encourage the ultimate consumer of any agricultural product to refrain from purchasing, consuming or using such agricultural product by the use of dishonest, untruthful and deceptive publicity. Per-

interests strongly counsels against abstention. "The abstention doctrine is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers. Ascertainment of whether there exist the 'special circumstances,' *Propper* v. *Clark,* 337 U. S. 472, prerequisite to its application must be made on a case-by-case basis. *Railroad Comm'n* v. *Pullman Co.,* 312 U. S. 496, 500; *NAACP* v. *Bennett,* 360 U. S. 471." *Baggett* v. *Bullitt,* 377 U. S. 360, 375 (1964). Relevant to the exercise of this equitable discretion, are "the constitutional deprivation alleged and the probable consequences of abstaining." *Harman* v. *Forssenius,* 380 U. S. 528, 537 (1965). "This Court often has remarked that the equitable practice of abstention is limited by considerations of ' "the delay and expense to which application of the abstention doctrine inevitably gives rise." ' *Lake Carriers'* *Assn.* v. *MacMullan,* 406 U. S., at 509, quoting *England* v. *Medical Examiners,* 375 U. S. 411, 418 (1964)." *Bellotti* v. *Baird,* 428 U. S. 132, 150 (1976). Therefore, when "constitutionally protected rights of speech and association," *Baggett* v. *Bullitt, supra,* at 378, are at stake, abstention becomes especially inappropriate. This is because "[i]n such [a] case to force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect." *Zwickler* v. *Koota, supra,* at 252.

Even assuming that appellees have the financial resources to pursue this case through the Arizona courts, appellees may

missible inducement or encouragement within the meaning of this section means truthful, honest and nondeceptive publicity which identifies the agricultural product produced by an agricultural employer with whom the labor organization has a primary dispute. Permissible inducement or encouragement does not include publicity directed against any trademark, trade name or generic name which may include agricultural products of another producer or user of such trademark, trade name or generic name." Section 23–1392 makes violation of § 23–1385 (B)(8) a crime.

well avoid speech that is perhaps constitutionally protected throughout the long course of that litigation, because such speech might fall within the cold shadow of criminal liability.[6] The potential for this self-censorship is abhorrent to the First Amendment. It should be permitted by a court in equity only for the most important of reasons. It cannot be tolerated on the basis of the slender ambiguity which the Court has managed to create in this statute. Abstention on this issue is therefore manifestly unjustified.[7]

---

[6] Appellees may be deterred from constitutionally protected speech even if the regulations which the Agricultural Employment Relations Act otherwise imposes on their speech are permissible under the First Amendment. This is because criminal sanctions discourage speech much more powerfully than do administrative regulations. Such sanctions would thus be more apt to cause employers and employees to "steer far wider of the unlawful zone," *Speiser* v. *Randall,* 357 U. S. 513, 526 (1958), and more likely to contract the "breathing space" necessary for the survival of "First Amendment freedoms." *NAACP* v. *Button,* 371 U. S. 415, 433 (1963). For this reason, it does not follow that because the First Amendment permits certain speech to be regulated, it must also permit such speech to be punished. See *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 348–350 (1974).

[7] Because of the First Amendment interests involved, my view is that the District Court on remand should issue an injunction "to protect appellees against enforcement of the state statute pending a definitive resolution of issues of state law by the Arizona courts. See *Harrison* v. *NAACP,* 360 U. S. 167, 178–179 (1959)." *Ante,* at 312 n. 18.