LET'S HELP FLORIDA, a Political
Committee, and Paul M. Bruun,
Plaintiffs-Appellees,

v.

Jesse M. McCRARY, Jr., as Secretary of
State of Florida, et al.,
Defendants-Appellants.

DADE VOTERS FOR A FREE CHOICE, a
Political Committee, and the Florida
Restaurant Association, Inc., Plaintiffs-
Appellees,

v.

George FIRESTONE, Secretary of
State of Florida, et al.,
Defendants-Appellants.

Nos. 78-2497, 79-2091.

United States Court of Appeals,
Fifth Circuit.

July 11, 1980.

David E. Cardwell, Director, Div. of Elections, Ronald A. Labasky, Legal Counsel, Tallahassee, Fla., Steven L. Bolotin, Anthony C. Musto, Asst. Attys. Gen., Dept. of Legal Affairs, Miami, Fla., for defendants-appellants in No. 78–2497.

Tobias Simon, Theodore L. Tripp, Jr., Miami, Fla., for plaintiffs-appellees in No. 78–2497.

Anthony C. Musto, Steven L. Bolotin, Asst. Attys. Gen., Miami, Fla., Ronald A. Labasky, Tallahassee, Fla., for defendants-appellants in No. 79–2091.

Ausley, McMullen, McGehee, Carothers & Proctor, Steven J. Uhlfelder, Tallahassee, Fla., Steel, Hector & Davis, Donald M. Middlebrooks, Talbot D'Alemberte, Miami, Fla., for plaintiffs-appellees in No. 79–2091.

Before THORNBERRY, FRANK M. JOHNSON, Jr. and HENDERSON, Circuit Judges.

THORNBERRY, Circuit Judge:

In these consolidated cases we must decide whether Florida statutes that restrict the size of contributions to a single political committee in a referendum election violate the first amendment rights of persons who want to contribute more than the maximum amount allowed by the statutes. Because campaign contributions implicate important first amendment rights and because Florida has shown no sufficiently important interest to justify restricting the contributions in a referendum election, we affirm the district court decisions declaring these statutory restrictions unconstitutional.

*I. Facts.*

Let's Help Florida is a political committee organized and registered under Florida law for the express purpose of conducting "a public education campaign urging the passage of a constitutional amendment which will legalize casino gambling in Southern Florida." The committee waged a petition drive under the initiative provisions of the Florida constitution in an effort to place the casino gambling proposal on the ballot in the November 1978 election. The committee does not support any individual candidate.

The Florida legislature enacted a comprehensive election code effective January 1, 1978. Section 106.08(1)(d) of the code restricts the size of contributions to a single political committee like Let's Help Florida:

(1) No person or political committee shall make contributions to any candidate or political committee in this state, for any election, in excess of the following amounts:

. . . . .

(d) To any political committee in support of, or in opposition to, an issue to be voted on in a statewide election, $3,000.

The election code does not restrict the number of contributions a person can make to different political committees, nor does the code restrict the total amount of independent direct expenditures that a person can make without control by, coordination with, or consultation with any candidate, committee, or agent thereof. Fla.Stat.Ann. § 106.-011(5) (West Supp.1980). Political committees must disclose a variety of information upon registration. Fla.Stat.Ann. § 106.03 (West Supp.1980). Committees must also disclose information about all contributors, even those who make very small contributions. Fla.Stat.Ann. § 106.07 (West Supp. 1980). Various civil and criminal penalties apply for violations of the election code.

In February 1978 Let's Help Florida and a person desiring to contribute more than the statutory maximum amount filed suit against the secretary of state, attorney general, director of the division of elections, and the members of the state elections commission to invalidate section 106.08(1)(d) under the first and fourteenth amendments. In May 1978 the district court issued a decision invalidating the statute on constitutional grounds.

Dade Voters for a Free Choice is a political committee organized and registered un-

der Florida law to oppose passage of an ordinance that would prohibit smoking in public places; the voters considered this proposal in a countywide referendum election in May 1979. The committee does not support any individual candidate. Contributions to the Dade Voters committee were restricted to one thousand dollars by Fla. Stat.Ann. § 106.08(1)(e) (West Supp.1980), which applies to countywide elections in the same way that section 106.08(1)(d) applies to statewide elections.

In February 1979 Dade Voters and a party desiring to contribute more than the statutory maximum amount sued the secretary of state, director of the division of elections, and members of the elections commission to invalidate section 106.08(1)(e) under the first and fourteenth amendments. In March 1979 the district court relied upon its earlier decision in the *Let's Help Florida* case to strike down the statute.

## II. *Federal Jurisdiction and Review.*

■ Appellants in the *Dade Voters* case raise several contentions questioning federal jurisdiction and review. Appellants first contend that the district court lacked jurisdiction because no case or controversy existed between the parties. The Supreme Court summarized the test to determine whether a case or controversy exists with regard to first amendment rights in *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 99 S.Ct. 2301, 2309, 60 L.Ed.2d 895 (1979):

> When the plaintiff has alleged an intention to engage in a course of conduct, arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973).

In *Babbitt* the Supreme Court allowed a union to challenge the constitutionality of a state statute regulating election procedures, consumer publicity, and criminal sanctions, even though no elections or prosecutions had yet occurred. The Court said that

> . . . when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need not "first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute." *Steffel v. Thompson*, 415 U.S. 452 at 459, 94 S.Ct. 1209 at 1216, 39 L.Ed.2d 505. . . . Moreover, the State has not disavowed any intention of invoking the criminal penalty provision against unions that commit unfair labor practices. Appellees are thus not without some reason in fearing prosecution . . .

99 S.Ct. at 2310–11. The Dade Voters committee wanted to receive larger contributions than the statute allowed. The committee had already received a few contributions larger than the statutory maximum, and other potential donors, including the co-plaintiff in this case, indicated that they would make larger contributions if the law allowed them to do so. The defendants have the statutory duty to enforce the election code. Fla.Stat.Ann. § 106.22–106.27 (West Supp.1980). They have not disavowed any intention to enforce the statute. On the contrary, counsel for the defendants said that the state would be compelled to begin proceedings against the plaintiffs if the statute is upheld. Record, Vol. III, at 41–42. These facts show that the plaintiffs' fear of prosecution is not imaginary or wholly speculative, and that a sufficient case or controversy exists to establish federal jurisdiction under *Babbitt*, and under Fifth Circuit cases such as *International Society for Krishna Consciousness v. Eaves*, 601 F.2d 809, 817–19 (5th Cir. 1979) and *Septum, Inc. v. Keller*, 614 F.2d 456, 459 (5th Cir. 1980). This conclusion is not contrary to the Second Circuit opinion in *St. Martin's Press, Inc. v. Carey*, 605 F.2d 41 (2d Cir. 1979). In *St. Martin's Press* the court held that no case or controversy existed when a publisher brought a first amendment challenge to enjoin state prosecutors from enforcing a child pornography statute against a book that was outside the scope of the statute, and against which the prosecutors declared they would not enforce the

statute. 605 F.2d at 44–45. In contrast to St. Martin's Press, plaintiffs in this case desire to engage in conduct that is in clear violation of a statute which the state has indicated it will enforce against them.

■ Appellants also contend that the district court should have abstained from hearing this case under principles announced in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *Younger* abstention principles are inapplicable to this case, however, because no state prosecution was pending when the plaintiffs filed suit. *Steffel v. Thompson*, 415 U.S. 452, 475, 94 S.Ct. 1209, 1223, 39 L.Ed.2d 505 (1974).

■ Appellants finally contend that the district court should not have issued injunctive relief. A federal court may enjoin state officials from enforcing an unconstitutional statute. *Ex parte Young*, 209 U.S. 123, 165–68, 28 S.Ct. 441, 456–457, 52 L.Ed. 714 (1908). An injunction is proper in this case because no legal remedy could correct the irreparable injury to plaintiffs' first amendment rights, important for an election only weeks away. *See Elrod v. Burns*, 427 U.S. 347, 373–74 & n. 29, 96 S.Ct. 2673, 2689–2690, 49 L.Ed.2d 547 (1976) (loss of first amendment rights unquestionably constitutes irreparable injury).

*III. First Amendment.*

■ The right to make political contributions is protected under the first amendment as an important freedom of association. *Buckley v. Valeo*, 424 U.S. 1, 25, 96 S.Ct. 612, 637, 46 L.Ed.2d 659 (1976). In *Buckley* the Supreme Court struck down federal restrictions upon direct political expenditures in candidacy elections, but upheld similar restrictions upon contributions to a candidate or to a committee supporting a candidate. As a general preface to its decision, the Court explained that contributions required less first amendment protection than did direct expenditures:

A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues.

. . . . .

The overall effect of the Act's contribution ceilings is merely to require candidates and political committees to raise funds from a greater number of persons and to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression, rather than to reduce the total amount of money potentially available to promote political expression.

424 U.S. at 21–22, 96 S.Ct. at 636.

■ Even though contributions receive less first amendment protection than do direct expenditures, a state may restrict political contributions only if the state "demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." 424 U.S. at 25, 96 S.Ct. at 638. The sole governmental interest that the Supreme Court recognized as a justification for restricting contributions was the prevention of quid pro quo corruption between a contributor and a candidate. 424 U.S. at 26–29, 96 S.Ct. at 638–640. The governmental interest in restricting contributions to candidates is substantial because actual corruption resulting from a candidate's dependence upon large individual contributors would undermine the integrity of representative democracy, and even the appearance of corruption that arises from public awareness of the possibilities for abuse would erode confidence in the democratic system. *Id.*

■ The state's interest in preventing the actual or apparent corruption of candidates, which the Supreme Court found so compelling in *Buckley*, does not justify restrictions upon political contributions in referendum elections. When people elect a candidate, they choose someone to whom they can delegate their political decision-making. The people's need to prevent large

contributors from improperly influencing this representative decisionmaker is critical. In contrast, when people vote on a referendum proposal, they directly decide the pertinent political issue for themselves. Large contributions for publicity by one group or another do not influence the political decisionmakers—in this case, the voters themselves—except in a manner protected by the first amendment. The distinction between the state's interest in regulating a candidacy election and in regulating a referendum election was discussed by the Supreme Court in *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1976). In striking down a Massachusetts statute that prohibited a corporation from making expenditures or contributions for publicity in a referendum election unrelated to the corporation's immediate business, the Court observed that

> Referenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue. To be sure, corporate advertising may influence the outcome of the vote; this would be its purpose. But the fact that advocacy may persuade the electorate is hardly a reason to suppress it: The Constitution "protects expression which is eloquent no less than that which is unconvincing." . . . We noted only recently that "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment . . . ."

435 U.S. at 790, 98 S.Ct. at 1423 (footnotes and citations omitted). This distinction between candidacy and referendum elections has been recognized by several other courts in striking down state restrictions upon contributions for referendum elections. *See C & C Plywood Corporation v. Hanson*, 583 F.2d 421, 424–25 (9th Cir. 1978) (invalidating Montana law that prohibited corporations from making contributions in a referendum election); *Citizens Against Rent Control v. City of Berkeley*, 99 Cal.App.3d 736, 160 Cal.Rptr. 448, 451–55 (Ct.App., 1st Dist. 1979) (invalidating city ordinance that restricted the size of contributions in a referendum election); *Schwartz v. Romnes*, 495 F.2d 844, 852–53 (2d Cir. 1974) (New York statute prohibiting corporate expenditures for political purposes must be construed narrowly under first amendment so that corporations may make contributions in referendum elections). With regard to referendum elections, appellants cannot justify the statutory restrictions upon political contributions as a means for preventing corruption.

Appellants also contend that the restrictions upon the size of contributions to a single committee are necessary to promote adequate disclosure about who is financing a campaign. In the absence of these restrictions, appellants contend that corporations and wealthy individuals would mask their participation in a referendum campaign by funneling large sums of money into a committee which the public would see only under an innocuous title such as "Let's Help Florida" or "Dade Voters for a Free Choice." Although promoting disclosure of campaign contributors is an important state interest, the restrictions upon political contributions in sections 106.08(1)(d), (e) cannot be justified as disclosure measures because the statutes are not closely drawn to avoid unnecessary abridgment of associational freedoms. These statutes that restrict the amount a person may contribute to a single committee do little to promote disclosure. The primary effect of the statutes is to compel large contributors who support or oppose a referendum issue to form multiple partisan committees, each of which can receive the maximum amount from a single contributor under the statute. These multiple committees provide no additional disclosure; the public still sees only the innocuous names of the different committees, and not the identities of the underlying contributors.

Florida can and does effectively promote the disclosure of large contributors through measures that are less harmful to first amendment rights. For example, sec-

tions 106.03 and 106.07 of the Florida Election Code require political committees to register with the state and to file information about each contribution and contributor throughout the campaign. This information is available to the public and may be published through newspapers and other media. Section 106.143 requires disclosure of the source of payment for all political advertisements and campaign literature. Measures such as these provide adequate disclosure without directly restricting contributions or other important first amendment rights. *See C & C Plywood*, 583 F.2d at 425 (rejecting argument that state interest in promoting disclosure justifies prohibition of corporate contributions in a referendum election).

Because the Florida statutes that restrict the size of contributions in a referendum election abridge important first amendment rights and are ill-suited for preventing corruption or for promoting disclosure, we affirm the decision in the court below.

AFFIRMED.