RICHMOND MEDICAL CENTER FOR WOMEN; William G. Fitzhugh, M.D.; Hillcrest Clinic; Herbert C. Jones, Jr., M.D.; Planned Parenthood of Metropolitan Washington, DC, Incorporated; Virginia League for Planned Parenthood; Planned Parenthood of the Blue Ridge, Plaintiffs–Appellees,

v.

James GILMORE, in his official capacity as Governor of the State of Virginia; David M. Hicks, in his (CA–98–309–3) official capacity as Commonwealth Attorney for the City of Richmond; Donald S. Caldwell, in his official capacity as Commonwealth Attorney for the County of Roanoke; Howard Gwynn, in his official capacity as Commonwealth Attorney for the City of Newport News; Charles D. Griffith, Jr., in his official capacity as Commonwealth Attorney for the City of Norfolk; Robert F. Horan, Jr., in his official capacity as Commonwealth Attorney for the County of Fairfax; James L. Camblos, III, in his official capacity as Commonwealth Attorney for the County of Albemarle, Defendants–Appellants.

No. 98–1930.

United States Court of Appeals, Fourth Circuit.

Decided July 29, 1998.

Dissent Filed Aug. 11, 1998.

### ORDER

Upon the record and after briefing and oral argument, it is adjudged and ordered that the motion to vacate the stay of the district court's order appealed from shall be, and it hereby is, denied.

Judge Widener and Judge Luttig vote to deny the motion, Judge Murnaghan would vacate the stay and votes to grant the motion.

The members of the panel may append to this order their reasons for their positions in writing.

With the concurrences of Judge Murnaghan and Judge Luttig.

MURNAGHAN, Circuit Judge:

Because of shortness of time, aggravated by summer holiday vacation plans, I proceed herewith under the order of July 29, 1998, to express my reasons for disagreeing with the decision of my colleagues to leave in effect the stay of the preliminary injunction. I accordingly dissent.

In considering whether to stay an order entered by the district court pending an appeal to this Court, it is not our province to rule on the merits of the underlying suit, or to determine the merits of the appeal. Before a stay may issue, however, we must determine that the movant has made a "strong showing" that it is likely to prevail on appeal. *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987). In the instant case, therefore, a stay of the preliminary injunction should issue only if it is likely that a panel of this court will conclude that the district court abused its discretion in issuing the injunction. *See Direx Israel, Ltd v. Breakthrough Medical Corp.,* 952 F.2d 802, 814 (4th Cir.1991). Because, in my view, the Commonwealth has failed to make the requisite showing of a likelihood of success on appeal, I would vacate the stay entered by Judge Luttig.

The facts of the case and text of the Partial Birth Abortion Act (the "Act"), Va. Code § 18.2–74.2, have been set forth in the memorandum opinion of the district court, *Richmond Medical Center v. Gilmore,* 11 F.Supp.2d 795 (E.D. Va.1998), and in the opinion issued by Judge Luttig as a single circuit judge, *Richmond Medical Center v. Gilmore,* 144 F.3d 326 (4th Cir.1998). For brevity's sake, I do not repeat them here.

At the threshold, the Commonwealth alleges that the plaintiffs lack standing to assert a constitutional challenge to the Act. I am not convinced that the Commonwealth is likely to prevail on the question of standing.

To establish standing, a plaintiff who contests the constitutionality of a criminal statute must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and ... a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); *see Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (finding that the standing requirement was satisfied where plaintiffs "alleged an actual and well-founded fear that the law [would] be enforced against them"). "[I]maginary or speculative" fears of prosecution are insufficient to confer standing. *Younger v. Harris,* 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

Because a plaintiff must allege a credible threat of prosecution under the challenged statute, the State's intent to enforce the provision is a relevant consideration. *See Babbitt,* 442 U.S. at 302, 99 S.Ct. 2301. "If the prosecutor expressly agrees not to prosecute, a suit against him for declaratory and injunctive relief is not such an adversary case as will be reviewed here." *Poe v. Ullman,* 367 U.S. 497, 507, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961).

The plaintiffs have conceded that they do not perform, and do not presently intend to perform, the D & X procedure as it is described by Dr. Martin Haskell, the American College of Obstetricians and Gynecologists, and the American Medical Association. That concession does not end the inquiry, however, for the Act's definition of "partial birth abortion" is intentionally broader than the medical descriptions of the D & X procedure. According to the Commonwealth, "[a]lthough the D & X procedure is the target of the Act, the definition of 'partial birth abortion' used ... by the General Assembly is cast in terms that will encompass not only the identified medical formulations of the procedure, but as-yet unidentified and/or uninvented *variations* of the D & X procedure."

The testimony adduced by Dr. William Fitzhugh at the preliminary injunction hearing shows that he performs abortions proscribed by the Act. Dr. Fitzhugh testified that he performs abortions through the 20th or 21st week of pregnancy, measured from the first day of the woman's last normal menstrual period ("lmp"). After the first trimester, or beginning at approximately 14 weeks lmp, Dr. Fitzhugh performs abortions using a method that has been labeled "dilatation and evacuation," or "D & E." Before the D & E procedure, Dr. Fitzhugh conducts an ultrasound examination and a medical evaluation. The purpose of the examination is not to look for signs of life, but to determine the size and age of the fetus. Nevertheless, the absence or presence of cardiac activity is noted.

On the day before the procedure, osmotic dilators are placed in the woman's cervix. By absorbing moisture from the surrounding cervical tissue, the dilators expand and cause dilation of the cervix and a softening of the tissue. The dilators are removed and anesthesia is 4 administered. A suction cannula is placed into the uterus to rupture the membrane surrounding the pregnancy and to remove fluid and tissue. Finally, forceps are used to remove the pregnancy.

Dr. Fitzhugh testified that it is never his intent to disjoin the fetus in the woman's uterus, but rather, to remove the fetus into the vagina. Whether that goal is accomplished depends on the degree of dilation. If the woman's cervix is sufficiently dilated, Dr. Fitzhugh testified that he uses the forceps to grasp the fetus and deliver it intact into the vagina. The umbilical cord

is then severed, and the fetus and placenta removed. If, however, as is more common, the dilation of the cervix does not permit removal of the intact fetus, the use of the forceps will cause fetal dismemberment as the physician grasps and tugs on parts of the fetus.

Although Dr. Fitzhugh's ability to remove the fetus into the vagina intact involves an element of uncertainty, his testimony was clear that the delivery of the fetus into the vagina is both deliberate and intentional. Unless the umbilical cord has been severed by suction, or the fetus was dead at the commencement of the procedure, the fetus is living at the time of delivery into the vagina.

If intact delivery of a living fetus into the vagina is accomplished, Dr. Fitzhugh testified that his next act is to sever the umbilical cord. The severance of the umbilical cord kills the fetus. When he effects delivery of the fetus into the vagina, therefore, Dr. Fitzhugh does so with the purpose of performing a procedure that he knows will kill the fetus. And Dr. Fitzhugh does not cut the umbilical cord by chance, but does so deliberately and intentionally. Finally, Dr. Fitzhugh completes the removal of the fetus and placenta from the mother's body. In short, Dr. Fitzhugh's testimony plainly establishes that he intends to perform a procedure that is prohibited by the Act each time he commences a D & E abortion, although circumstances may prevent the performance of the D & E as he intends.

In analyzing whether any plaintiff has standing to pursue the instant suit, we are required to consider the defendants' sworn assurances that physicians who perform suction curettage and "conventional" D & E abortions will not be prosecuted under the Act. No "credible threat of prosecution" may be found where the officials responsible for enforcement of the Act have expressly agreed not to prosecute violations. *See Babbitt,* 442 U.S. at 302, 99 S.Ct. 2301; *Poe,* 367 U.S. at 507, 81 S.Ct. 1752.

The Commonwealth Attorneys have, however, defined a "conventional" D & E in such a manner as to exclude the D & E abortions performed by Dr. Fitzhugh. According to the Commonwealth Attorneys, a conventional D & E is

an abortion procedure technique in which the physician . . . dismembers the fetus in the uterine cavity using sharp instruments such as forceps, and suction [and] then removes the fetal parts by pulling them out piece by piece through the cervical os.

Dr. Fitzhugh, however, does not commence a D & E with the intention of using forceps to dismember the fetus in the woman's uterus, but rather, uses the forceps to grasp and pull the intact fetus into the vagina. Commonly, the force employed will cause dismemberment of the fetus, and Dr. Fitzhugh may escape prosecution in those instances; but there is no assurance that a prosecution will not follow when Dr. Fitzhugh achieves his intended goal of delivering an intact fetus into the vagina. Given the Commonwealth's asserted intent to prosecute "variations" of the D & X procedure, I conclude that Dr. Fitzhugh reasonably fears prosecution for his conduct, and has standing to pursue a constitutional challenge to the Act. Having so concluded, I do not consider the standing of the other plaintiffs. *See Carey v. Population Servs. Int'l,* 431 U.S. 678, 682, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Doe v. Bolton,* 410 U.S. 179, 189, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

Concerning the merits of the plaintiffs' challenge to the Act on the ground that it is void for vagueness, I believe that, whatever the other definitional merits or deficiencies of the Act, the term "substantial portion" is hopelessly vague and is likely to render the Act unconstitutional. In the short course of the instant litigation, the Commonwealth itself has variously defined the term "substantial portion" to mean "a portion of the trunk," one-third of the fetus by volume, "well into the thorax,"

twenty-five percent, thirty-five percent, or a portion that is "not insubstantial." The Commonwealth's own medical expert, Dr. K. Aultman, testified that the definition of the term would change depending on whether length or volume supplied the standard of measurement. Length and volume, moreover, are not the only possible standards; it would also be reasonable to define a "substantial portion" of a living fetus with reference to what we consider to be meaningful or important parts of the human anatomy.

Dr. Aultman conceded that liability under the Act may change depending on the meaning ascribed to the term. If a leg is a "substantial portion" of a fetus, Dr. Aultman admitted that many "conventional" D & E procedures would be prohibited by the Act. If, on the other hand, a leg is *not* a "substantial portion" of a fetus, those same procedures fall outside the Act's proscription on partial birth abortions. In short, the lack of definitional clarity leaves abortion providers without fair notice of the line between lawful and unlawful conduct. Therefore, I think it likely that the Act will be found unconstitutionally vague. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

Definitional precision aside, I cannot be persuaded that it is constitutionally permissible to enact a ban on partial birth abortions without, at a minimum, allowing the performance of such an abortion when necessary, in the professional judgment of the attending physician, to preserve the health of the mother. The Supreme Court has unequivocally established that the State has no interest which supersedes the mother's interest in preserving her health. *See Planned Parenthood v. Casey,* 505 U.S. 833, 880, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (stating that "the essential holding of *Roe* forbids a State to interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her health"); *Roe v. Wade,* 410 U.S. 113, 164–65, 93

S.Ct. 705, 35 L.Ed.2d 147 (1973). In *Casey,* moreover, the Court suggested that the Constitution would be violated by an abortion regulation which prevented a physician from exercising his or her medical judgment on the mother's behalf. *Casey,* 505 U.S. at 884, 112 S.Ct. 2791.

By failing to include a maternal health exception in the Act, the General Assembly of Virginia has attempted to substitute its judgment regarding the safety and necessity of the partial birth abortion procedure for the individualized professional judgment of the physicians who provide abortions. There may be physicians who will testify that the partial birth abortion procedure is *never necessary to 7 preserve* the health of the mother; I believe, however, that the Constitution mandates that determination be left to the physician as he or she confronts the unique circumstances of each case.

By failing to include a maternal health exception, the Act demands that physicians decide, often under exigent circumstances, whether their failure to perform a partial birth abortion will cause maternal death or merely result in a significant impairment to the woman's health. An erroneous judgment will subject the physician to prosecution and, if the physician has wrongly concluded that only the mother's health is at risk, may cause the death of the mother. I cannot be persuaded that the Constitution permits such a result.

Finally, I do not find that the Commonwealth will suffer irreparable injury absent a stay. *See Hilton,* 481 U.S. at 776, 107 S.Ct. 2113. While the Commonwealth has asserted that several legitimate state interests are served by the Act's prohibition of partial birth abortions, it was conceded at oral argument that the D & X procedure—the procedure at which the Act is allegedly aimed—is not performed by any abortion providers in Virginia. I cannot see, therefore, how a temporary injunction prohibiting enforcement of the Act, while making sure what it means and ascertaining whether it is constitutional, will work

irreparable injury upon the Common-wealth.

In contrast, the plaintiffs are likely to suffer substantial harm if the stay is grant-ed. *See id.* Abortion providers face sig-nificant uncertainty in determining which abortion methods are proscribed and which are permitted. Moreover, the Act constitutes a grave intrusion into the phy-sician's right to exercise his independent medical judgment.

In conclusion, I find the Common-wealth's contention that the plaintiffs lack standing unconvincing, and believe a panel of this court will likely hold that the pre-liminary injunction was properly issued. Therefore, I would vacate the stay ordered by Judge Luttig.