COURT OF APPEALS OF VIRGINIA


Present:    Judges Elder, Humphreys and Senior Judge Coleman
Argued at Richmond, Virginia


CHESAPEAKE BAY FOUNDATION, INC.

                                                              OPINION BY
v.        Record No. 1175-05-2                        JUDGE LARRY G. ELDER
                                                              APRIL 4, 2006

COMMONWEALTH OF VIRGINIA, *ex rel.*
  STATE WATER CONTROL BOARD,
  DEPARTMENT OF ENVIRONMENTAL QUALITY,
  ROBERT G. BURNLEY, DIRECTOR, DEPARTMENT OF
  ENVIRONMENTAL QUALITY AND
  PHILIP MORRIS USA INC.


            FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
                        Frederick G. Rockwell, III, Judge

            Jon A. Mueller (Brian L. Buniva; LeClair Ryan, on briefs), for
            appellant.

            John K. Byrum, Jr., Assistant Attorney General (Judith Williams
            Jagdmann, Attorney General; Roger L. Chaffe, Senior Assistant
            Attorney General, on brief), for appellee Commonwealth of
            Virginia, *ex rel.* State Water Control Board, Department of
            Environmental Quality, and Robert G. Burnley, Director,
            Department of Environmental Quality.

            Brooks M. Smith (Andrea W. Wortzel; Hunton & Williams LLP, on
            brief), for appellee Philip Morris USA Inc.


        The Chesapeake Bay Foundation, Inc. (CBF) appeals from a decision dismissing its

challenge to a permit issued to Philip Morris USA Inc. by the State Water Control Board

(SWCB), upon the recommendation of the Department of Environmental Quality (DEQ) and

Director Robert Burnley.  CBF contends the circuit court erroneously granted the demurrers of

SWCB, DEQ, Burnley, and Philip Morris.  CBF argues the court erroneously held that Virginia

law does not provide for representational standing and that CBF failed to plead sufficient facts to

demonstrate standing to sue in its own right. In the alternative, CBF contends the trial court erroneously denied its motion for leave to amend its petition to allege additional facts sufficient to establish standing. Based on this Court's decision in <u>Chesapeake Bay Foundation and Citizens of Stumpy Lake v. Commonwealth</u>, 46 Va. App. 104, 616 S.E.2d 39 (2005) [hereinafter <u>Stumpy Lake</u>], we hold the trial court's conclusion that Virginia law does not permit representational standing was erroneous. We hold further the facts alleged in CBF's petition for appeal, accepted as true, were sufficient to survive the appellees' demurrers. Thus, we reverse the trial court's dismissal of the petition with prejudice without addressing the trial court's ruling on CBF's request for leave to amend, and we remand to the trial court for further proceedings consistent with this opinion.

I.

BACKGROUND

Because this case involves the granting of a demurrer, we accept as true, for purposes of reviewing this motion only, all facts alleged in the petition. <u>See</u> Code § 8.01-273; <u>Runion v. Helvestine</u>, 256 Va. 1, 7, 501 S.E.2d 411, 415 (1998); <u>Stumpy Lake</u>, 46 Va. App. at 107, 616 S.E.2d at 41.

CBF is a nonprofit Maryland corporation that is registered to do business in Virginia; maintains offices in Richmond and Norfolk; and has approximately 40,000 members who reside in Virginia. It is the largest conservation organization dedicated solely to protecting the Chesapeake Bay watershed and its tributaries, including the James River.

In 2004, the SWCB reissued to Philip Morris a permit under the Virginia Pollution Discharge Elimination System (VPDES), allowing it to discharge into the James River, from its Park 500 Plant in Chester, wastewater containing, *inter alia*, certain levels of nitrogen and phosphorus. CBF actively participated in the public comment process related to the permit.

After the permit's reissuance, CBF filed a petition for appeal in the Circuit Court of Chesterfield County alleging that the levels of certain substances Philip Morris was allowed to discharge under the permit exceeded applicable state and federal standards.

In its twenty-five page petition, CBF alleged that it

> meets the legal standing standards required for obtaining judicial review [of the permit] under Va. Code Ann. § 62.1-44.29. The CBF has suffered and will continue to suffer actual and/or imminent injury and represents members and citizens of the Commonwealth who have suffered and will continue to suffer actual and imminent injury:
>
> a. resulting from the unlawful re-issuance of the Permit and authorizing Philip Morris to discharge nitrogen and phosphorus pollution to this water quality limited and "impaired waters" segment of the James River in amounts and concentrations that do not ensure that Virginia [water quality standards] WQS will be maintained;
>
> b. the injuries suffered are directly traceable to the unlawful "case decision" rendered by the SWCB and implemented by Burnley by its decision to re-issue the Permit to Philip Morris; and
>
> c. the injuries suffered by CBF and its members are capable of effective and meaningful redress by a favorable decision of this Court setting aside the Permit, and remanding the "case decision" to the SWCB with instructions to re-issue the Permit . . . and ordering the Permit to include numeric effluent limitations for nitrogen and phosphorus in concentrations and amounts that will ensure that the Virginia WQS for this segment of the James River will be maintained as is required by law and valid regulations.

CBF provided more detailed information regarding the ways in which it alleged it and its members would be harmed by the permit. It also alleged an equal protection violation, contending Philip Morris's permit was more favorable than one issued to the Crooked Run Sewage Treatment Facility on the same day. CBF asked the court to suspend the challenged permit and requested various other forms of relief.

Philip Morris and the Commonwealth filed demurrers and motions to dismiss, contending, *inter alia*, that no relevant statute authorized CBF to sue in a representational capacity; that CBF failed to plead sufficient facts to show standing to sue in its own right; that the equal protection claim failed to state a claim upon which relief could be granted; that DEQ and Director Burnley were improper parties; and that much of the relief sought was beyond that authorized by the Administrative Process Act.

On January 4, 2005, after hearing argument on the motions, the circuit court granted the motions, reasoning as follows:

> [CBF] has not alleged any . . . specific injury-in-fact. While the CBF asserts that the "permitted discharges will cause injury to the CBF and its programs as well as its members," (Pet. P. 5), the CBF fails to state what impact the discharge will have on its educational or restorative programs, the operation of its vessel, the recreational or aesthetic activities of its members or its replenishment of underwater grasses in segments of the James River.[5]
>
> [5] To the contrary, the CBF states that phosphorus, nitrogen, and other effluent contents will foster plant growth. (Pet. 8-9).
>
> Consequently, the Court finds that the CBF does not have standing as an individual to sue.

The court ruled that no Virginia statute authorized CBF to sue in a representative capacity. The court also refused to grant CBF leave to amend its petition. The court granted the demurrers and noted that it was not necessary to "address the ancillary issues of equal protection, unavailability of relief prayed for, and misjoinder of parties."

CBF then filed a motion for reconsideration or, in the alternative, for leave to amend its petition for appeal "to allege in greater detail its Article III 'case' or 'controversy' standing element required by Va. Code § 62.1-44.29." The trial court denied the motion, again rejecting CBF's representational standing claim and its request for leave to amend. On the latter issue, the court reasoned that CBF "failed to initially plead any [injuries in fact]," that "any allegation of

- 4 -

specific injury to the CBF will be new," and that "[s]uch an addition is impermissible." On April 28, 2005, the court entered an order denying the motion to amend and granting appellees' motions to dismiss with prejudice.

II.

ANALYSIS

"A demurrer admits the truth of all material facts properly pleaded. . . . [T]he facts admitted are those *expressly alleged*, those which fairly can be viewed as *impliedly alleged*, and those which may be *fairly and justly inferred* from the facts alleged." Rosillo v. Winters, 235 Va. 268, 270, 367 S.E.2d 717, 717 (1988) (emphases added). A demurrer does not "admit 'inferences or conclusions from facts *not* stated.'" Arlington Yellow Cab v. Transp., Inc., 207 Va. 313, 319, 149 S.E.2d 877, 881 (1966) (quoting 71 C.J.S. Pleading § 261, at 528, 529).

A demurrer "does not admit the correctness of the pleader's conclusions of law. [Its] function . . . is to test the legal sufficiency of the facts. Because our review of a circuit court's decision sustaining a demurrer addresses that same legal question, we review the circuit court's judgment *de novo*." Stumpy Lake, 46 Va. App. at 110-11, 616 S.E.2d at 42 (citations omitted).

Our resolution of this appeal turns first on whether CBF pleaded sufficient facts to demonstrate standing to challenge SWCB's issuance of the VPDES permit to Philip Morris.

> "A plaintiff has standing to institute a . . . proceeding if it has a 'justiciable interest' in the subject matter of the proceeding, *either in its own right or in a representative capacity*. In order to have a 'justiciable interest' in a proceeding, the plaintiff must demonstrate an actual controversy between the plaintiff and the defendant, such that his rights will be affected by the outcome of the case."

Id. at 119-20, 616 S.E.2d at 47 (quoting W.S. Carnes, Inc. v. Bd. of Supers., 252 Va. 377, 383, 478 S.E.2d 295, 299 (1996) (citations omitted)) (emphasis added). CBF asserts the trial court incorrectly ruled that Virginia does not recognize representational standing and that it has

pleaded facts sufficient to prove both standing to sue in its own right and representational standing on behalf of its members. We agree on all counts.

A.

STANDING OF CBF TO SUE IN ITS OWN RIGHT

Code § 62.1-44.29, the State Water Control Law's judicial review provision, provides as follows:

> Any owner aggrieved by, or any person who has participated, in person or by submittal of written comments, in the public comment process related to, a final decision of the Board under [various provisions of the State Water Control Law], whether such decision is affirmative or negative, is entitled to judicial review thereof in accordance with the provisions of the Administrative Process Act . . . if such person meets the standard for obtaining judicial review of a case or controversy pursuant to Article III of the United States Constitution. A person shall be deemed to meet such standard if (i) such person has suffered an actual or imminent injury which is an invasion of a legally protected interest and which is concrete and particularized; (ii) such injury is fairly traceable to the decision of the Board and not the result of the independent action of some third party not before the court; and (iii) such injury will likely be redressed by a favorable decision by the court.

The parties agree that in order for CBF to plead sufficient facts to establish standing to sue in its own right, it must meet this three-part test. "While each of the three prongs of standing should be analyzed distinctly, their proof often overlaps." Friends of the Earth, Inc. [(FOE)] v. Gaston Copper Recycling Corp., 204 F.3d 149, 154 (4th Cir. 2000) (reversing dismissal, following six-day bench trial, for lack of standing based on "holding that none of plaintiffs' members had shown injury in fact").

1.      Injury in Fact

The injury alleged to support a claim of standing must be both (a) concrete and particularized and (b) actual or imminent, thereby "preclud[ing] those with merely generalized grievances from bringing suit to vindicate an interest common to the entire public." Id. at 156.

- 6 -

Such an injury may be to the plaintiff's economic interests, but it may also be to the plaintiff's "aesthetic or recreational interests." Id. at 154. "Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process" as long as "the party seeking review [is] himself among the injured." Sierra Club v. Morton, 405 U.S. 727, 734-35, 92 S. Ct. 1361, 1366, 31 L. Ed. 2d 636, 643 (1972). Thus, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." FOE v. Laidlaw Environmental Servs. (TOC), Inc., 528 U.S. 167, 183, 120 S. Ct. 693, 705, 145 L. Ed. 2d 610, 628 (2000); see Lujan v. Defenders of Wildlife, 504 U.S. 555, 562-63, 112 S. Ct. 2130, 2137, 119 L. Ed. 2d 351, 365 (1992) ("[T]he desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for purpose of standing.").

Although the injury alleged must be concrete and particularized, it "'need not be large[;] an identifiable trifle will suffice.'" Gaston Copper, 204 F.3d at 156 (quoting Sierra Club v. Cedar Point Oil Co., 73 F.3d 546, 557 (5th Cir. 1996) (internal quotation marks omitted)). Further, "[t]he Supreme Court has consistently recognized that threatened rather than actual injury can satisfy Article III standing requirements. 'One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough.'" Id. at 160 (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S. Ct. 2301, 2308, 60 L. Ed. 2d 895, 906 (1979) (internal quotation marks omitted)) (citations omitted). Where the claim of injury is based on allegations that a company is discharging chemicals in quantities that exceed those specified in a permit and the discharge restrictions were "set at the level necessary to protect the designated uses of the receiving

waterways, the[] violation [of the discharge restrictions] necessarily means that these [designated] uses may be harmed." Id. at 156-57.

Here, CBF has alleged sufficient facts to claim both the existence of an injury in fact and to allege the injury is to itself as an organization.

CBF's claim of injury is similar to the claim made in Gaston Copper. Gaston Copper involved an allegation that the company was violating its permit, which contained limits formulated to protect the statutorily designated uses of the receiving waterways. Id. Here, CBF's allegation is that the permit itself fails to comply with federal and state statutory limits formulated to protect the designated uses of the receiving waterways, thereby involving tacit governmental approval of the alleged polluting via issuance of the permit. CBF cites 9 VAC 25-260-10(A), which provides that all state waters, which necessarily include the James River segment into which the subject Philip Morris facility discharges its wastewater, are designated for certain "recreational uses, e.g., swimming and boating; the propagation and growth of a balanced, indigenous population of aquatic life, including game fish, which might reasonably be expected to inhabit them; and the production of edible and marketable natural resources, e.g., fish and shellfish." Further, the SWCB is charged with developing "water quality standards" or "criteria" which, if met, "will generally protect the designated use[s]" of the body of water to which they apply. See 9 VAC 25-260-5; 9 VAC 25-260-20. The SWCB's general criteria provide that

> [s]tate waters . . . shall be free from substances attributable to
> sewage, industrial waste, or other waste in concentrations,
> amounts, or combinations which contravene established standards
> or interfere directly or indirectly with designated uses of such
> water or which are inimical or harmful to human, animal, plant, or
> aquatic life. Specific substances to be controlled include . . .
> substances that produce . . . turbidity . . . and substances which
> nourish undesirable or nuisance aquatic plant life.

9 VAC 25-260-20(A).

Thus, here, as in Gaston Copper, an allegation of "the[] violation [of the discharge restrictions, if proved,] necessarily means that these [designated] uses may be harmed." Gaston Copper, 204 F.3d at 156-57. Further, CBF alleged with specificity that the unlawful discharges of nitrogen and phosphorus "nourish undesirable or nuisance aquatic plant life" by "assisting in the formation of nuisance algae blooms" and increase chlorophyll-a, turbidity and other things that contribute to the failure of the relevant segment of the James River to meet state and federal water quality standards. These statements allege a concrete and imminent threat of harm to "the propagation and growth of a balanced, indigenous population of aquatic life, including game fish, which might reasonably be expected to inhabit [the subject waters]." See 9 VAC 25-260-10(A).

CBF further alleged with particularity that the organization itself is "among [those] injured" by the alleged violation. Morton, 405 U.S. at 735, 92 S. Ct. at 1366, 31 L. Ed. 2d at 643. CBF, sometimes using its own vessel, "The Chesapeake," "travels the James River impaired waters around and downstream from the [Philip Morris] facility for its educational, recreational, and Bay restorative efforts, all of which are harmed by the continuing excessive discharge of nutrients . . . as authorized by the challenged permit." CBF detailed one particular program that "[is] and will continue to be adversely affected by the unlawful nutrient discharges"--its "replenishment of underwater aquatic grasses in the vicinity of and downstream from the Philip Morris facility." CBF explained that it

> has and continues to operate programs designed to reduce the effect of [discharges such as Philip Morris's], including in and downstream from the water quality impaired segment of the James River where Philip Morris discharges its wastewater, including planting underwater aquatic grasses necessary for the healthy maintenance and replenishment of aquatic plant, fish and animal life destroyed in part by [the excessive effluent discharges allowed under the permit].

CBF also alleged that it expended over $100,000 on its James River replanting program during the previous fiscal year and that it sponsored an average of 84 trips each year for that purpose, in which approximately 1,800 volunteers participate. Sufficiently implicit, if not explicit, in these allegations is that the allegedly excessive discharge of effluents allowed by the permit has contributed to the destruction of indigenous aquatic plant, fish and animal life, and that the discharge, if allowed to continue, threatens to do the same to the grasses CBF has planted in an effort to combat the harm caused by the allegedly unlawful ongoing discharges. Thus, CBF has alleged sufficient economic, aesthetic, and recreational injuries to itself, injuries that are both concrete and particularized and actual or imminent, to establish standing to maintain suit.

### 2.    Causal Connection

To withstand the appellees' demurrer, the petition must also allege the claimed injury is "fairly traceable to the decision of the Board and not the result of the independent action of some third party not before the court." Code § 62.1-44.29.

> The "fairly traceable" requirement ensures that there is a genuine nexus between a plaintiff's injury and a defendant's alleged illegal conduct. But traceability "'does not mean that plaintiffs must show to a scientific certainty that defendant's effluent . . . caused the precise harm suffered by the plaintiffs.'" . . . Rather than pinpointing the origins of particular molecules, a plaintiff "must merely [allege] that a defendant discharges a pollutant that causes *or contributes* to the kinds of injuries alleged" in the specific geographic area of concern. In this way a plaintiff demonstrates that a particular defendant's discharge has affected or has the potential to affect his interests.

Gaston Copper, 204 F.3d at 161 (quoting Natural Resources Defense Council, Inc. v. Watkins, 954 F.2d 974, 980 & n.7 (4th Cir. 1992) (quoting Public Interest Group of New Jersey, Inc. v. Powell Duffryn Terms., Inc., 913 F.3d 64, 72 (3d Cir. 1990))) (internal quotation marks omitted from and emphasis added in last quoted passage).

The same allegations cited above as being sufficient to plead injury in fact also constitute facts sufficient to plead the necessary causal nexus in this case. CBF alleges that SWCB's issuance of the permit allows the discharge of effluents at levels in excess of those permitted by state and federal law and that Philip Morris's discharge of nitrogen and phosphorus in concentrations and amounts authorized by the permit (1) *contributes* to the growth of "undesirable or nuisance plant life" by "assisting in the formation of nuisance algae blooms" and increasing chlorophyll-a, turbidity and other things that contribute to the failure of the relevant segment of the James River to meet state and federal water quality standards, (2) *contributes* to the destruction of "aquatic plant, fish and animal life," and (3) *contributes* to the destruction of aquatic grasses planted by CBF in an effort to foster "the healthy maintenance of replenishment of aquatic plant, fish and animal life." CBF need not allege that Philip Morris's Park 500 Plant is the only facility discharging effluents capable of causing this harm. "It would be strange indeed if polluters were protected from suit simply by virtue of the fact that others are also engaging in the illegal activity." American Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 520 (4th Cir. 2003).

### 3.     Redressability

Finally, a plaintiff must allege sufficient facts to support the conclusion that his injury "will likely be redressed by a favorable decision by the court." Code § 62.1-44.29. He also "must demonstrate standing separately for each form of relief sought." Laidlaw, 528 U.S. at 185, 120 S. Ct. at 706, 145 L. Ed. 2d at 629. "The redressability requirement ensures that a plaintiff 'personally would benefit in a tangible way from the court's intervention.'" Gaston Copper, 204 F.3d at 162 (quoting Warth v. Seldin, 422 U.S. 490, 508, 95 S. Ct. 2197, 2210, 45 L. Ed. 2d 343, 360 (1975)). This benefit need not be monetary to be sufficiently tangible. Laidlaw, 528 U.S. at 185-87, 120 S. Ct. at 706-07, 145 L. Ed. 2d at 629-31. The Supreme Court has recognized that

- 11 -

"citizen plaintiffs facing ongoing violations" have standing to seek civil penalties in appropriate cases. Id. "To the extent [civil penalties] encourage defendants to discontinue current violations and deter them from committing future ones, they afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct." Id. at 186, 120 S. Ct. at 706-07, 145 L. Ed. 2d at 630.

Appellees contend the harm alleged by CBF is not redressable by a decision vacating the permit because CBF's allegations concede that Philip Morris is not the sole or even the primary contributor of nutrients to the James River. We disagree. As discussed above, the harm or threatened harm may be an "'identifiable trifle.'" Gaston Copper, 204 F.3d at 156 (quoting Cedar Point Oil Co., 73 F.3d at 557). Thus, as long as the relief CBF seeks would redress the part of the harm caused by Philip Morris, that harm is, in fact, redressable to the extent required to demonstrate standing. As quoted above, "[I]t would be strange indeed if polluters were protected from suit simply by virtue of the fact that others are also engaging in the illegal activity." American Canoe Ass'n, 326 F.3d at 520.

Thus, we hold the harm alleged is redressable to the extent that CBF seeks to have the permit set aside and re-issued only if it complies with applicable laws necessary to ensure that water quality standards shall be maintained.[1]

B.

REPRESENTATIONAL STANDING

1.    Legal Validity of Doctrine in Virginia

By letter opinions of January 4 and April 8, 2005, incorporated into its order of April 28, 2005, the trial court ruled that Code § 62.1-44.29 of the State Water Control law did not confer

---

[1] We do not address in this appeal whether the trial court has the authority to render the other forms of relief CBF seeks.

upon CBF standing to sue in a representational capacity. However, by decision rendered July 19, 2005, a panel of this Court reached the opposite conclusion. See Stumpy Lake, 46 Va. App. at 111-18, 616 S.E.2d at 42-46. Following an extended analysis in Stumpy Lake, we held that "Virginia recognizes representational standing . . . and that Code § 62.1-44.29 confers this representational standing" in cases meeting its requirements. Id. (relying on Concerned Taxpayers of Brunswick County v. DEQ, 31 Va. App. 788, 525 S.E.2d 628 (2000) (holding almost identical judicial review provision in Solid Waste Management Act authorized representational standing in case meeting its requirements), rev'd on other grounds sub nom., Aegis Waste Solutions v. Concerned Taxpayers of Brunswick County, 261 Va. 395, 544 S.E.2d 660 (2001)). Although a petition for appeal of the Stumpy Lake decision was filed, the Supreme Court ultimately refused to consider the appeal on the merits. See Commonwealth v. CBF, No. 051767 (Va. Sup. Ct. Jan. 25, 2006). Thus, our decision in Stumpy Lake remains binding legal precedent.

Appellees recognize that *stare decisis* may bind us to follow the decision in Stumpy Lake. Nevertheless, quoting Commonwealth v. Burns, 240 Va. 171, 174, 395 S.E.2d 456, 457 (1990), they argue we are not so bound if we find that the decision in Stumpy Lake was based on "'flagrant error or mistake.'" Appellees misconstrue the holding in Burns, which permits this Court to correct "'flagrant error or mistake' in a panel decision . . . through the *en banc* hearing process." Burns, 240 Va. at 174, 395 S.E.2d at 457. Contrary to appellees' assertions, Burns affirms the principle that the decision of one panel is binding on all other panels unless and until reversed by the Court sitting *en banc* or by a higher court on appeal. Id.; see Johnson v. Commonwealth, 252 Va. 425, 429-30, 478 S.E.2d 539, 541 (1996). Thus, we are not at liberty to revisit the holding of the panel in Stumpy Lake that "Virginia recognizes representational

- 13 -

standing . . . and that Code § 62.1-44.29 confers this representational standing" in cases meeting its requirements.  46 Va. App. at 118, 616 S.E.2d at 46.

2.    Sufficiency of Facts Pleaded to Establish Representational Standing[2]

"[A]n association has Article III standing to sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"  Stumpy Lake, 46 Va. App. at 114, 616 S.E.2d at 44 (quoting Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441, 53 L. Ed. 2d 383, 394 (1977)).

(a)    Standing of Members to Sue in Their Own Right

As our holding in Stumpy Lake, 46 Va. App. at 116, 616 S.E.2d at 45, reiterates, the first prong of the representational standing test requires that "at least one member of the association, but not all of its members," satisfy the three-part test for Article III standing set out in Lujan, 504 U.S. at 560-61, 112 S. Ct. at 2136, 119 L. Ed. 2d at 364, and adopted in Code § 62.1-44.29: First, there must be an injury in fact that is both "(a) concrete and particularized[] and (b) actual or imminent."  Stumpy Lake, 46 Va. App. at 112, 616 S.E.2d at 43.  Second, "a causal connection must exist between the injury and the conduct complained of."  Id.  Third, "it must be likely that the injury would be redressed by a favorable decision."  Id.  We hold CBF's petition contains sufficient allegations to plead injury in fact, causation and redressability as to at least one of its members.

_____

[2] The record does not make clear whether the trial court considered the sufficiency of the facts pleaded to establish representational standing.  Regardless, because this question involves a demurrer and, thus, does not require the resolution of any disputed factual issues, we may consider it in this appeal.  Cf. Stumpy Lake, 46 Va. App. at 111, 616 S.E.2d at 42 (noting review of circuit court ruling on demurrer is *de novo*).

As discussed above, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Laidlaw, 528 U.S. at 183, 120 S. Ct. at 705, 145 L. Ed. 2d at 628.  The injury "'need not be large[;] an identifiable trifle will suffice.'" Gaston Copper, 204 F.3d at 156 (quoting Cedar Point Oil Co., 73 F.3d at 557 (internal quotation marks omitted)).  Further, "threatened rather than actual injury can satisfy Article III standing requirements.  'One does not have to await the consummation of threatened injury to obtain preventive relief.  If the injury is certainly impending that is enough.'" Id. at 160 (quoting Babbitt, 442 U.S. at 298, 99 S. Ct. at 2308, 60 L. Ed. 2d at 906 (internal quotation marks omitted)) (citations omitted).  Where the claim of injury is based on allegations that a company is discharging chemicals in quantities that exceed those specified in a permit and the discharge restrictions were "set at the level necessary to protect the designated uses of the receiving waterways, the[] violation [of the discharge restrictions] necessarily means that these [designated] uses may be harmed." Id. at 156-57.

As with the allegation of harm to CBF as an organization, the claim of injury to CBF's members as individuals rests on allegations that the permit allows the discharge of chemicals in amounts greater than those set by applicable law to protect the designated uses of the receiving waterway.  As set out above, relevant water quality regulations provide that all state waters, which necessarily include the James River segment into which the subject Philip Morris facility discharges its wastewater, are designated for certain "recreational uses, e.g., swimming and boating; the propagation and growth of a balanced, indigenous population of aquatic life, including game fish, which might reasonably be expected to inhabit them; and the production of edible and marketable natural resources, e.g., fish and shellfish." 9 VAC 25-260-10(A).  Thus,

here, as in Gaston Copper, an allegation of "the[] violation [of the discharge restrictions, if proved,] necessarily means that these [designated] uses may be harmed." Gaston Copper, 204 F.3d at 156-57.

CBF further alleged with particularity that its members are "among [those] injured" by this alleged violation. Morton, 405 U.S. at 735, 92 S. Ct. at 1366, 31 L. Ed. 2d at 643. It expressly asserted as follows:

> The discharge of nutrients in amounts and concentrations authorized by the unlawful Permit, which does not ensure that the Virginia WQS [water quality standards] for this stream segment will be maintained, has and will continue to cause injury to . . . [CBF's] members who regularly use and enjoy the James River . . . for swimming, boating, kayaking, canoeing, sport fishing, and other educational and recreational pursuits.

CBF need not, at the pleading stage, name those members or further specify how they have been harmed. Laidlaw, 528 U.S. at 183, 120 S. Ct. at 705, 145 L. Ed. 2d at 628.

(2)     Causal Connection

These same allegations provide a sufficient causal connection between the act and the harm under the standards set out in Part II.A.2, *supra*.

(3)     Redressability

For the reasons set out in Part II.A.3, *supra*, we hold the harm alleged is redressable to the extent that CBF seeks to have the permit set aside and re-issued only if it complies with applicable laws necessary to ensure that water quality standards shall be maintained.[3]

(b) and (c)  Nature of Interests and Requested Relief

Appellees do not expressly challenge parts (b) and (c) of the representational standing test, which require that "'(b) the interests [the organization] seeks to protect are germane to [its]

---

[3] We do not address in this appeal whether the trial court has the authority to render the other forms of relief CBF seeks.

- 16 -

purpose[] and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Stumpy Lake, 46 Va. App. at 114, 616 S.E.2d at 44 (quoting Hunt, 432 U.S. at 343, 97 S. Ct. at 2241, 53 L. Ed. 2d at 394). We hold that the facts alleged satisfy all prongs of the test for representational standing.

Thus, we conclude that CBF has alleged sufficient facts to establish standing to sue in both an individual and a representative capacity.

C.

RULING ON MOTION FOR LEAVE TO AMEND TO
CORRECT DEFICIENCIES IN PLEADING

Because we hold CBF alleged sufficient facts to establish standing to sue in both an individual and a representative capacity, we need not consider the trial court's ruling on CBF's request for leave to amend its petition for appeal.

III.

For these reasons, we hold the trial court's conclusion that Virginia law does not permit representational standing was erroneous. We hold further the facts alleged in CBF's petition for appeal, accepted as true, were sufficient to survive the appellees' demurrers. Thus, we reverse the trial court's dismissal of the petition with prejudice without addressing the trial court's ruling on CBF's request for leave to amend, and we remand to the trial court for further proceedings consistent with this opinion.

Reversed and remanded.