COURT OF APPEALS OF VIRGINIA


Present:    Judges Elder, Clements and Senior Judge Bumgardner
Argued at Richmond, Virginia


CHESAPEAKE BAY FOUNDATION, INC.
                                                              OPINION BY
v.        Record No. 2545-07-2                        JUDGE LARRY G. ELDER
                                                          NOVEMBER 4, 2008
COMMONWEALTH OF VIRGINIA, *ex rel.*
  VIRGINIA STATE WATER CONTROL BOARD,
  DAVID K. PAYLOR, DIRECTOR,
  VIRGINIA DEPARTMENT OF ENVIRONMENTAL QUALITY
  AND CITY OF NEWPORT NEWS, VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                          Theodore J. Markow, Judge

            Jon A. Mueller (Joseph J. Tannery; Chesapeake Bay Foundation,
            Inc., on briefs), for appellant.

            Alfred B. Albiston, Assistant Attorney General (Robert F.
            McDonnell, Attorney General; Roger L. Chaffe, Senior Assistant
            Attorney General, on brief), for appellees Commonwealth of
            Virginia, *ex rel.* Virginia State Water Control Board and David K.
            Paylor, Director, Virginia Department of Environmental Quality.

            M. Scott Hart (James E. Ryan, Jr.; George A. Somerville; Stuart
            Katz, City Attorney; Allen L. Jackson, Chief Deputy City Attorney;
            Troutman Sanders LLP, on brief), for appellee City of Newport
            News, Virginia.


        The Chesapeake Bay Foundation, Inc. (CBF), appeals from a decision upholding the

extension of a Virginia Water Protection Permit (VWP permit) previously issued to the City of

Newport News for the construction and operation of a reservoir in King William County.  On

appeal, CBF contends the circuit court erred in granting the demurrers of Newport News and the

Commonwealth agencies and official involved in the proceedings,[1] contending the court erroneously found that CBF lacked standing to pursue the appeal because it did not sufficiently allege that extension of the VWP permit at issue caused it to "suffer[] an actual or imminent injury." We hold the facts alleged in CBF's petition for appeal, along with the reasonable inferences therefrom, accepted as true, were sufficient to survive appellees' demurrers on the issue of standing. Thus, we reverse the circuit court's dismissal of the petition and remand to the circuit court for further proceedings consistent with this opinion.

I.

BACKGROUND

On February 15, 2007, appellant filed a petition for appeal of the State Water Control Board's decision to grant an extension and modification of a VWP permit issued to the City of Newport News in 1997. "Because the circuit court decided the matters upon demurrer, we shall recite the facts alleged, and all reasonable inferences flowing from those facts, as though they are true, in accordance with settled principles of appellate review." Citizens for Stumpy Lake v. State Water Control Bd., 46 Va. App. 104, 107, 616 S.E.2d 39, 41 (2005) [hereinafter Stumpy Lake]; see infra Part II (discussing in greater detail the standard of review applicable on appeal of the granting of a demurrer). So, viewed, the facts as pleaded in that petition for appeal, and supplemented by the attached exhibits and other information in the record, indicated as follows:

On December 22, 1997, upon the recommendation of the Department of Environmental Quality (DEQ), the State Water Control Board (the Board) issued a VWP permit to the City of Newport News. The activity authorized by the permit was the City's construction and operation of a reservoir on Cohoke Creek in King William County and the transfer of water from that

---

[1] We use the label "Commonwealth" to refer to those entities, in addition to the City of Newport News, participating in this appeal as appellees—the State Water Control Board (the Board), the Department of Environmental Quality (DEQ) and DEQ's Director, David Paylor.

reservoir to other locations [hereinafter "the King William Reservoir" or "the reservoir"]. The permit was set to expire on December 22, 2007. The permit constituted certification by the Commonwealth—as required by Section 401 of the Clean Water Act, 33 U.S.C. §§ 1251 to 1376, and the State Water Control Law and related regulations—that "there is a reasonable assurance that the activity authorized by this permit, if conducted in accordance with the conditions set forth herein, will protect instream beneficial uses and will not violate applicable water quality standards."

The VWP permit authorized the destruction of 437 acres of wetlands, established compensatory wetlands mitigation terms requiring the establishment of twice as many acres of new wetlands to compensate for the wetlands to be destroyed by the project. It also required actions designed to ensure protection of minimum instream flows in the Mattaponi River, the primary source of water for the King William Reservoir. The VWP permit required the completion of certain studies and the preparation of certain plans before construction of the reservoir could begin. Those studies and plans as listed in the permit included a habitat evaluation procedure study; a detailed final wetland mitigation plan for the required mitigation; an ecomonitoring plan to include fish spawning and nursery grounds and vegetative composition and distribution; and a salinity monitoring plan. It also required that the permittee "comply with all applicable Federal and State statutes [and] regulations."

The VWP permit was only one of three permits the City was required to obtain before beginning construction on the reservoir. In September 2004, the Virginia Marine Resources Commission granted Newport News a permit (1) allowing it to "[e]ncroach in, on or over State owned subaqueous bottom[land]s" for the purpose of constructing the reservoir and (2) imposing numerous restrictions on the reservoir's operation. In November 2005, the United States Army Corps of Engineers granted the City's request for a permit for the project under

Section 404 of the federal Clean Water Act, 33 U.S.C. § 1344 [hereinafter "the Section 404 permit"]. CBF and others challenged the Section 404 permit, and their suit was pending in federal court when CBF filed the petition for appeal in these proceedings. CBF and others also challenged issuance of the VWP permit in state court. See Mattaponi Indian Tribe v. Dep't of Envtl. Quality ex rel. State Water Control Bd., 43 Va. App. 690, 601 S.E.2d 667 (2004), aff'd sub. nom. Alliance to Save the Mattaponi v. Commonwealth, 270 Va. 423, 443, 621 S.E.2d 78, 89 (2005), cert. denied, 126 S. Ct. 2862, 165 L. Ed. 2d 895 (2006). That challenge was ultimately resolved in the City's favor.

When it became apparent to the City of Newport News that, due to the delays caused by litigation involving the various permits, it would not be able to complete the studies required by the VWP permit and begin construction of the reservoir prior to expiration of the VWP permit in December 2007, it requested a five-year extension of the VWP permit. The Board published notice of the City's request and received public comment thereon. CBF actively participated in the public comment process by presenting written comments and oral testimony to the Board.

DEQ, which advises the Board on environmental matters, recommended to the Board that it grant the requested five-year extension subject to the "additional condition that the permittee submit an application for permit reissuance concurrent with the submittal of the final mitigation plan." The Board, however, decided not to approve DEQ's recommendation and so notified the City. The City then filed a timely petition for a formal administrative hearing before the Board, to which it was entitled as a matter of right pursuant to applicable regulations. However, while the City's petition for a formal hearing was pending, the city manager wrote DEQ Director David Paylor and asked that the Board "reconsider" its decision denying the requested five-year

- 4 -

extension, stating that a reconsideration based on certain issues would likely avoid the need for a formal hearing.  The city manager wrote as follows:

> The City applied for the extension so that we would be able to complete a detailed wetland mitigation plan and provide other valuable information that would be needed by the Board before it considered a renewal of the permit.  While we understand that an extension of the permit would not create any greater expectation or certainty that the Board would approve our application for re-issuance of the permit, this extension assists us in securing the monies required to complete the studies and to fulfill the conditions of the original State permit.  Favorable action on the extension will provide assurance that we are taking the appropriate and necessary steps to put us in the position to obtain a renewal.

> \*     \*     \*     \*     \*     \*     \*

> If the Board is willing to reconsider their September 6, 2006 decision [denying the permit extension request] and grant an adequate extension of time without having to conduct a formal hearing, we would be amenable to a condition, as part of the extension that prohibits the construction of project facilities under the current permit. . . .

The Board accepted the request to reconsider and then granted the request for issuance of a "Modification" of the permit with an extended expiration date.  Although the permit continued to state that it "authorize[d] the construction and operation of the [listed] water resources infrastructure" comprising the King William Reservoir, it also included a contradictory new provision stating as follows:

> During the term of this permit, there shall be no construction of project facilities or other site preparation or construction activity, *except as necessary to complete the evaluations, studies, plans and reports required by this permit or the permit issued by the U.S. Army Corps of Engineers pursuant to Section 404 of the federal Clean Water Act for the construction of this project.*

(Emphasis added.)  It also provided that, "Any interest in land acquired after December 14, 2006 and before this permit expires or is reissued shall not be construed as increasing any investment

backed expectation that a permit to authorize construction and operation of the reservoir and appurtenant structures will be issued or re-issued in the future." Finally, it recognized that

> [d]uring the term of this permit, prior to the use of eminent domain by the permittee, property owners shall be offered an opportunity to enter into an option agreement providing the necessary property rights to carry out the plans, studies, and other activities required under permits for the project and containing an acceptable purchase price should the property ultimately be acquired to complete the project. The permittee shall use its best efforts to ensure that King William County provides the same opportunity.

The new permit was scheduled to expire "on December 21, 2010, unless a complete application is submitted by that date. If a complete application for reissuance of the permit is submitted by December 21, 2010, then the permit will expire on December 21, 2012. Such application shall include a final mitigation plan prepared in accordance with . . . this permit."

CBF filed a request for a formal hearing before the Board. It also filed notice of appeal and then a petition for appeal of the Board's issuance of the modified permit. In that petition CBF challenged the procedure by which the Board extended the expiration date for the VWP permit as a result of its regularly scheduled meeting of December 14, 2006. CBF sought the following relief:

> entry of "a final decree finding that the challenged agency action was not in accordance with the law"; the setting "aside [of] the [permit] extension"; and remand to the Board "with instructions (1) to reinstate its final decision of September 6, 2006 denying the extension to the Permit, (2) to conduct a formal hearing regarding extension of the Permit as requested by both CBF and Newport News; and (3) to comply fully with the mandates of the [APA], the State Water Control Law, and all applicable regulations."

The Commonwealth and the City of Newport News both demurred to CBF's petition for appeal, contending *inter alia* that CBF lacked standing to appeal because neither it nor any of its members suffered any harm as a result of the VWP permit extension. They also contended that if any harm did occur, it was not causally related to the restricted permit and was unlikely to be

redressed by a favorable decision. Finally, they averred the Board had authority to reconsider its decision and acted consistently with the applicable law and regulations.

CBF, in its memoranda in opposition to the demurrers of the Commonwealth and the City, argued it pleaded sufficient facts to establish Article III standing both in a representational capacity and individually for the organization itself.

At the motion hearing, the trial judge asked the City why, if the permit did not allow it to build anything, it needed to have the permit period extended. The City responded as follows:

> That's a good question, Your Honor. . . . The permit issued in 1997 had a number of conditions that the City had to satisfy in order to begin construction. Among those are requirements that it do several studies. The studies take a long time, they're very expensive, but they are an expression from the State Water Control Board of the information it needs to authorize this.
>
> \*     \*     \*     \*     \*     \*     \*
>
> And this process is continuing with [DEQ] working with the City in performing these studies and determining how they should be done and getting them done. So continuing the permit continues the process. . . . If the permit expired and there were no more permit, there would be no official statement of what it is the City had to do.
> Now whether or not the [DEQ] would continue to work with the City, I don't know. I would hope they would, but certainly while this process is ongoing, there's a team in place, and if the permit were to expire, there would be no further directive.
> . . . If construction is ever allowed, it will be because some new permit will be granted by the board. We have not even applied for that permit. When we do, [CBF] will participate. . . . [T]here would be an imminent injury then if we had a permit allowing construction. We don't now, so there is no imminent injury, Your Honor.

CBF, in its response, focused on the procedural harm it alleged it had suffered based on the Board's reconsideration of the permit extension request. The Court recognized that, pursuant to the modified permit, "you can go out and do borings or studies that we might need in the future," but said "that's all it does, isn't it?" CBF responded, "There are a lot of other things. . . .

- 7 -

Part of that permit requires them to mitigate the harm . . . of destroying 400 and some odd acres of wetlands. And so they have to do that by buying county property in other counties and turning that property into wetlands." The trial judge observed "they can [acquire property] anyway."

The City then sought to clarify, averring

> the City could acquire land without any permit from the [Board]. The [Board's] jurisdiction is over waters of the State, including wetlands. The condition that the board added requires that the City not do any land-disturbing activities in the permit area [and] . . . we wouldn't need the board's permission to do that except in the creeks that are in there, but because we were agreeing to that, we asked the board to modify that and say except as are necessary to do studies that are required. So we are not going to do things we could not do otherwise. Principally they are archeological studies for Indian artifacts, but they're not in the creeks. The Indians don't camp in creeks, they camped next to creeks, but because the board's condition was so broad, that was added. But your point essentially . . . is correct, the things we are going to do, we could have done anyways.

The circuit court granted the demurrer, ruling as follows:

> Although Phillip Morris USA, Inc. v. Chesapeake Bay Foundation, [273 Va. 564, 576-77,] 643 S.E.2d 219, [225-26] (2007)[,] provides for representational as well as individual standing for environmental groups in similar cases; here, the Appellant can not show that it has suffered an actual or imminent injury by the extension of the King William Reservoir permit.
> The extension of the permit prohibits the construction or operation of any part of the reservoir and specifically limits the city's actions to environmental quality and impact studies. As the Appellant's argument for injury is based on the alteration of the current water flow and environmental impact of building and operating the King William Reservoir, the Appellant cannot have suffered injury from the extension of the permit prohibiting these actions.
> *Finding that the Appellant lacks standing, the court need not rule on other aspects of the demurrer.*

It is, therefore, ORDERED that the demurrer is sustained.
This matter is dismissed. Appellant's objections are noted.

(Emphasis added.)

Appellant noted this appeal.

II.

"A demurrer admits the truth of all material facts properly pleaded [for the purpose of ruling on the demurrer]. . . . [T]he facts admitted are those *expressly alleged*, those which fairly can be viewed as *impliedly alleged*, and those which may be *fairly and justly inferred* from the facts alleged." Rosillo v. Winters, 235 Va. 268, 270, 367 S.E.2d 717, 717 (1988) (emphases added). A demurrer does not "admit 'inferences or conclusions from facts not stated.'" Arlington Yellow Cab v. Transp., Inc., 207 Va. 313, 319, 149 S.E.2d 877, 881 (1966) (quoting 71 C.J.S. Pleading § 261, at 528, 529). A demurrer also "does not admit the correctness of the pleader's conclusions of law. [Its] function . . . is to test the legal sufficiency of the facts. Because our review of a circuit court's decision sustaining a demurrer addresses that same legal question, we review the circuit court's judgment *de novo*." Stumpy Lake, 46 Va. App. at 110-11, 616 S.E.2d at 42 (citations omitted).

Our resolution of this appeal turns on whether CBF pleaded sufficient facts to demonstrate it had standing—in either an individual capacity, a representational capacity, or both capacities—to challenge the Board's issuance of the VWP permit extension to the City of Newport News.

> "A plaintiff has standing to institute a . . . proceeding if it has a 'justiciable interest' in the subject matter of the proceeding, *either in its own right or in a representative capacity*. In order to have a 'justiciable interest' in a proceeding, the plaintiff must demonstrate an actual controversy between the plaintiff and the defendant, such that his rights will be affected by the outcome of the case."

Id. at 119-20, 616 S.E.2d at 47 (quoting W.S. Carnes, Inc. v. Bd. of Supers., 252 Va. 377, 383, 478 S.E.2d 295, 299 (1996) (citations omitted)) (emphasis added).

A.

STANDING TO SUE IN ITS OWN RIGHT

Code § 62.1-44.29, the State Water Control Law's judicial review provision, provides as follows:

> Any owner aggrieved by, or any person who has participated, in person or by submittal of written comments, in the public comment process related to, a final decision of the Board under [various provisions of the State Water Control Law], whether such decision is affirmative or negative, is entitled to judicial review thereof in accordance with the provisions of the Administrative Process Act . . . if such person meets the standard for obtaining judicial review of a case or controversy pursuant to Article III of the United States Constitution. A person shall be deemed to meet such standard if (i) such person has suffered an actual or imminent injury which is an invasion of a legally protected interest and which is concrete and particularized; (ii) such injury is fairly traceable to the decision of the Board and not the result of the independent action of some third party not before the court; and (iii) such injury will likely be redressed by a favorable decision by the court.

In order for CBF to plead sufficient facts to establish standing to sue in its own right, it must meet this three-part test. "While each of the three prongs of standing should be analyzed distinctly, their proof often overlaps." Friends of the Earth, Inc. [(FOE)] v. Gaston Copper Recycling Corp., 204 F.3d 149, 154 (4th Cir. 2000) (reversing dismissal, following six-day bench trial, for lack of standing based on a "holding that none of plaintiffs' members had shown injury in fact"). The trial court ruled that CBF failed to allege sufficient facts to establish prong (i)—an imminent injury from the issuance of the modified permit—and, thus, that it lacked standing to pursue this appeal.[2]

---

[2] The trial court did not address whether the pleadings contained sufficient allegations of causation and redressability, the second and third prongs of the general test for individual standing. Because this question involves a demurrer and, thus, does not require the resolution of

- 10 -

## 1. Injury in Fact

The injury alleged to support a claim of standing must be both (a) concrete and particularized and (b) actual or imminent, thereby "preclud[ing] those with merely generalized grievances from bringing suit to vindicate an interest common to the entire public." Id. at 156. Such an injury may be to the plaintiff's economic interests, but it may also be to the plaintiff's "aesthetic or recreational interests." Id. at 154. "Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process" as long as "the party seeking review [is] himself among the injured." Sierra Club v. Morton, 405 U.S. 727, 734-35, 92 S. Ct. 1361, 1366, 31 L. Ed. 2d 636, 643 (1972). Thus, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." FOE v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 183, 120 S. Ct. 693, 705, 145 L. Ed. 2d 610, 628 (2000); see Lujan v. Defenders of Wildlife, 504 U.S. 555, 562-63, 112 S. Ct. 2130, 2137, 119 L. Ed. 2d 351, 365 (1992) ("[T]he desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for [the] purpose of standing.").

Although the injury alleged must be concrete and particularized, it "'need not be large[;] an identifiable trifle will suffice.'" Gaston Copper, 204 F.3d at 156 (quoting Sierra Club v. Cedar Point Oil Co., 73 F.3d 546, 557 (5th Cir. 1996) (internal quotation marks omitted)).

---

any disputed factual issues, we may consider all prongs of the standing test in this appeal. See CBF v. Commonwealth ex rel. State Water Control Bd., 48 Va. App. 35, 54 n.2, 628 S.E.2d 63, 72 n.2 (2006) (considering second and third prongs of individual standing test even though the trial court had not done so). For the same reason, we also consider the second and third prongs of the standing test in evaluating whether CBF alleged sufficient facts to establish representational standing. See infra Part II.B.

Further, "[t]he Supreme Court has consistently recognized that threatened rather than actual injury can satisfy Article III standing requirements. 'One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough.'" Id. at 160 (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S. Ct. 2301, 2308, 60 L. Ed. 2d 895, 906 (1979) (internal quotation marks omitted)) (citations omitted).

In addition, the injury alleged may involve an attempt to enforce a procedural right, "so long as the procedures in question are designed to protect some threatened *concrete interest* of the [petitioner's] that is the ultimate basis of [the petitioner's] standing." Lujan, 504 U.S. at 573 n.8, 112 S. Ct. at 2143 n.8, 119 L. Ed. 2d at 372 n.8 (emphasis added). Thus, for example,

> one living adjacent to the site for a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

Id. at 572 n.7, 112 S. Ct. at 2142 n.7, 119 L. Ed. 2d at 372 n.7; see Lemon v. Geren, 514 F.3d 1312, 1314-15 (D.C. Cir. 2008).

Here, the trial court found that, "As the Appellant's argument for injury is based on the alteration of the current water flow and environmental impact of building and operating the King William Reservoir, the Appellant cannot have suffered injury from the extension of the permit prohibiting these actions." A careful reading of the petition for appeal indicates that this statement is not entirely accurate. Although CBF alleged *in part* that it would be injured by what the trial court summarized as the "alteration of the current water flow" and "environmental impact of [actually] building and operating" the reservoir because the project would, *inter alia*, "destr[oy] . . . natural resources in and along the affected rivers" or "impair[] the aesthetic value of the rivers as an educational resource," it also alleged as follows:

- 12 -

16. CBF has suffered and will continue to suffer an actual and imminent injury traceable to the Board's reconsideration, granting and subsequent *extension* of the Permit to Newport News.

\* \* \* \* \* \* \*

21. The modified permit does not avoid the potential for harm to CBF or its members because it allows Newport News to undertake activities during the extended permit period that will further construction of the reservoir.

(Emphasis added.)

The modified permit, like the original permit, expressly required the completion of several studies and plans, including a habitat evaluation procedure study, a detailed final wetland mitigation plan, an ecomonitoring plan to include fish spawning and nursery grounds and vegetative composition and distribution, and a salinity monitoring plan. The modified permit also provided that

> there shall be no construction of project facilities or other site preparation or construction activity, except as necessary to complete the evaluations, studies, plans and reports required by this permit or the permit issued by the Army Corps of Engineers pursuant to Section 404 of the federal Clean Water Act for the construction of this project.

Thus, the permit expressly allows "site preparation or construction activity . . . as necessary to complete the [various] evaluations, studies, plans and reports *required by [the VWP permit]*," and the petition sufficiently alleges CBF will suffer an imminent injury because these activities will "destr[oy] . . . natural resources in and along the affected rivers" or "impair[] the aesthetic value of the rivers as an educational resource."

In addition, documents filed by the City in conjunction with a statement that the documents were key to an understanding of CBF's petition indicate that the Army Corps of Engineers had rendered a decision that the project would "cause flooding or excavation of 115 [archeological] sites, 79 of which were recommended . . . for further study." The City conceded

in argument that it was required to conduct such archeological studies and that the studies would be conducted adjacent to the existing creeks involved in the reservoir project because "[t]he Indians . . . camped next to creeks."  Thus, the petition and related exhibits also permit the inference of an allegation that the archeological excavating required by the federal § 404 permit and allowed by the VWP permit also would "destr[oy] . . . natural resources in and along the affected rivers" or "impair[] the aesthetic value of the rivers as an educational resource."

### 2.  Causal Connection

To withstand the appellees' demurrer, the petition must also allege the claimed injury is "fairly traceable to the decision of the Board and not the result of the independent action of some third party not before the court."  Code § 62.1-44.29.

> The "fairly traceable" requirement ensures that there is a genuine nexus between a plaintiff's injury and a defendant's alleged illegal conduct.  But traceability "'does not mean that plaintiffs must show to a scientific certainty that defendant's [specific action, such as the discharge of an] effluent[,] . . . caused the precise harm suffered by the plaintiffs.'" . . . [A] plaintiff "must merely [allege] that [the particular] defendant [engages in the type of activity] that causes *or contributes* to the kinds of injuries alleged" in the specific geographic area of concern.  In this way a plaintiff demonstrates that a particular defendant's [action] has affected or has the potential to affect his interests.

Gaston Copper, 204 F.3d at 161 (quoting Natural Resources Defense Council, Inc. v. Watkins, 954 F.2d 974, 980 & n.7 (4th Cir. 1992) (quoting Public Interest Group of New Jersey, Inc. v. Powell Duffryn Terms., Inc., 913 F.3d 64, 72 (3d Cir. 1990))) (internal quotation marks omitted from and emphasis added in last quoted passage).

Similarly, in the case of a procedural injury, see discussion supra Part II.A.1, the plaintiff need not prove that requiring the agency to follow the procedure at issue—such as preparing an environmental impact statement or supplementary statement—would have "'*force[d]* [the

agency] to alter [its] allegedly injurious course of action.'" Lemon, 514 F.3d at 1315 (quoting

Lemon v. Harvey, 448 F. Supp. 2d 97, 104 (D.D.C. 2006) (emphasis added)).  Instead,

> [t]he idea . . . is that if the agency's eyes are open to the
> environmental consequences of its actions and if it considers
> options that entail less environmental damage, it may be *persuaded*
> to alter what it proposed. . . .  Sometimes, the Article III injury in
> these types of cases is called a "procedural injury," the thought
> being that plaintiffs suffer harm from the agency's failure to follow
> [administrative] procedures, compliance with which might have
> changed the agency's mind for the reasons just given.

Id. (emphasis added).

Applying these principles, the Supreme Court has held that "the 'fairly traceable' prong

does not mean that 'the defendant's actions are the very last step in the chain of causation.'"

Mattaponi Indian Tribe v. Dep't of Envtl. Quality ex rel. State Water Control Bd., 261 Va. 366,

376, 541 S.E.2d 920, 925 (2001) (quoting Bennett v. Spear, 520 U.S. 154, 168-69, 117 S. Ct.

1154, 1164, 137 L. Ed. 2d 281, 299 (1997)).  As the Supreme Court explained in earlier

proceedings involving this same permit, the fact that the Army Corps of Engineers may be the

ultimate "permitting authority" for the reservoir project does not sever the causal connection

between the issuance of the state permit and the activities permitted or required under the federal

permit.  Id. at 377, 541 S.E.2d at 925.

> The federal [Clean Water] Act requires the state § 401
> certification to ensure that the proposed activity will meet state
> water quality standards and applicable effluent limitations.  33
> U.S.C. § 1341(a)(1).  The Commonwealth uses the state permit as
> the vehicle for the § 401 certification.

> The certification is issued if the proposed project "is
> consistent with the provisions of the [federal Clean Water Act] and
> will protect instream beneficial uses."  Code § 62.1-44.15:5(B)
> [now § 62.1-44.15:20(B)].  Beneficial use of Virginia's waters
> includes the preservation of instream flows for purposes of the
> protection of fish and wildlife resources and habitat, recreation,
> cultural, and aesthetic values.  Id.

Id. at 377, 541 S.E.2d at 925-26.  State Water Control Law also expressly provides that "it shall be unlawful to . . . [e]xcavate in a wetland" or engage in any "activities that cause significant alteration or degradation of existing wetland acreage or functions" "[e]xcept in compliance with an individual or general Virginia Water Protection [VWP] Permit issued in accordance with this article."  Code § 62.1-44.15:20(A).

Although a state's subsequent revocation of or refusal to reissue a VWP permit constituting § 401 certification does not automatically invalidate the previously issued federal Clean Water Act § 404 permit, the Army Corps of Engineers "'may,'" based on the state's revoking or refusing to reissue the state permit, "'elect to modify or revoke the [federal] permit at its own discretion.'"  Keating v. Fed'l Energy Reg. Comm'n, 927 F.2d 616, 623 n.4 (D.C. Cir. 1991).

CBF has sufficiently pleaded causation in this case, having alleged both (1) that the permit authorizes the City to engage in "site preparation [and] construction activity . . . as necessary to complete the evaluations, studies, plans and reports required by" both the VWP permit and "the permit issued by the U.S. Army Corps of Engineers pursuant to Section 404 of the federal Clean Water Act for construction of this project," which included a significant number of archeological excavations near the bodies of water to be affected by the reservoir project and (2) that such activities pose an imminent threat of harm to CBF because these activities will "destr[oy] . . . natural resources in and along the affected rivers" or "impair[] the aesthetic value of the rivers as an educational resource."  Although the Board's act of revoking the VWP § 401 permit, like the preparation of the environmental impact statement in Lemon, would not "'force'" revocation of the federal § 404 permit, it would be a factor for consideration by the federal permitting authority, the Army Corps of Engineers, in determining whether it, too, should revoke or perhaps modify the related federal permit.  See Lemon, 514 F.3d at 1315.

- 16 -

The City argued, however, that the excavation was separately authorized by a different type of federal permit, a Corps "Nationwide Permit," which had been unconditionally certified by the Commonwealth, such that the excavation would be permitted even if both the VWP permit and the federal § 404 permit were not extended or renewed. As discussed supra in Part II.A.1, although the City may have been *authorized* to excavate even if the specific state and federal reservoir permits were not extended or renewed, the nonrenewal of the VWP permit would decrease the likelihood that the City would conduct such excavations, and therefore, nonrenewal would provide some measure of protection for CBF from the "destruction of natural resources in and along the affected rivers" or "impair[ment of] the aesthetic value of the rivers as an educational resource."

### 3. Redressability

Finally, a plaintiff must allege sufficient facts to support the conclusion that his injury "will likely be redressed by a favorable decision by the court." Code § 62.1-44.29. "The redressability requirement ensures that a plaintiff 'personally would benefit in a tangible way from the court's intervention.'" Gaston Copper, 204 F.3d at 162 (quoting Warth v. Seldin, 422 U.S. 490, 508, 95 S. Ct. 2197, 2210, 45 L. Ed. 2d 343, 360 (1975)). This benefit need not be monetary to be sufficiently tangible. Laidlaw, 528 U.S. at 185-87, 120 S. Ct. at 706-07, 145 L. Ed. 2d at 629-31. Also, the benefit need not remedy the entire harm; "as long as the relief CBF seeks would redress the part of the harm caused by the [defendant], that harm is, in fact, redressable to the extent required to demonstrate standing." CBF, 48 Va. App. at 52, 628 S.E.2d at 72.

Here, CBF asks us to set aside the modified permit and remand to the Board for a formal hearing on the City's request for issuance of a modified permit. A ruling that the modified VWP permit should not have been issued without sufficient process would redress CBF's claim that

issuance of the permit allowing site preparation and construction as necessary to perform the enumerated studies exposes it to a risk of harm from the "destruction of natural resources in and along the affected rivers" or "impair[ment of] the aesthetic value of the rivers as an educational resource." As discussed above, although the Board's act of revoking the § 401 permit, like the preparation of the environmental impact statement in Lemon, would not "'force'" revocation of the federal § 404 permit, it would be a factor for consideration by the federal permitting authority, the Army Corps of Engineers, in determining whether it, too, should revoke or modify the related federal permit. See Lemon, 514 F.3d at 1315. Further, although the City was free to purchase land without the VWP permit extension, may have been able to exercise its condemnation powers, and may have been authorized by separate federal and state permits to conduct the archaeological excavations at issue, appellees conceded the City would have been much less likely to engage in those activities if the VWP permit extension had not been granted.

Thus, CBF has alleged sufficient facts to satisfy all three prongs of the test for individual standing.

B.

REPRESENTATIONAL STANDING

"[A]n association has Article III standing to sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Stumpy Lake, 46 Va. App. at 114, 616 S.E.2d at 44 (quoting Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441, 53 L. Ed. 2d 383, 394 (1977)).

## 1. Standing of Members to Sue in Their Own Right

As our holding in <u>Stumpy Lake</u>, 46 Va. App. at 116, 616 S.E.2d at 45, reiterates, the first prong of the representational standing test requires that "at least one member of the association, but not all of its members," satisfy the three-part test for Article III standing set out in <u>Lujan</u>, 504 U.S. at 560-61, 112 S. Ct. at 2136, 119 L. Ed. 2d at 364, and adopted in Code § 62.1-44.29: First, there must be an injury in fact that is both "(a) concrete and particularized[] and (b) actual or imminent." <u>Stumpy Lake</u>, 46 Va. App. at 112, 616 S.E.2d at 43. Second, "a causal connection must exist between the injury and the conduct complained of." <u>Id.</u> Third, "it must be likely that the injury would be redressed by a favorable decision." <u>Id.</u> We hold CBF's petition contains sufficient allegations to plead injury in fact, causation, and redressability as to at least one of its members.

As discussed in Part II.A.1., <u>supra</u>, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." <u>Laidlaw</u>, 528 U.S. at 183, 120 S. Ct. at 705, 145 L. Ed. 2d at 628. The injury "'need not be large[;] an identifiable trifle will suffice.'" <u>Gaston Copper</u>, 204 F.3d at 156 (quoting <u>Cedar Point Oil Co.</u>, 73 F.3d at 557 (internal quotation marks omitted)). Further, "threatened rather than actual injury can satisfy Article III standing requirements. 'One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough.'" <u>Id.</u> at 160 (quoting <u>Babbitt</u>, 442 U.S. at 298, 99 S. Ct. at 2308, 60 L. Ed. 2d at 906 (internal quotation marks omitted)) (citations omitted).

Here, CBF's petition alleged that some of its members are "affected individually by the *extension* of this permit" because they "boat, bird watch, fish, and otherwise recreate in the rivers and surrounding areas that would be harmed by the activities authorized by the Permit" and,

thus, that these members' "recreational and aesthetic interests . . . will be harmed . . . by the *modified* Permit." (Emphasis added.) As discussed above, the petition alleges that "[t]he modified permit does not avoid the potential for harm to CBF or its members because it allows Newport News to undertake activities during the extended permit period that will further construction of the reservoir." The modified permit, like the original permit, expressly requires the completion of several studies and plans, including a habitat evaluation procedure study, a detailed final wetland mitigation plan, an ecomonitoring plan to include fish spawning and nursery grounds and vegetative composition and distribution, and a salinity monitoring plan. The modified permit, unlike the original permit, expressly recognizes the City may need either to acquire a right of access to property necessary "to carry out the plans, studies, and other activities required under permits for the project" or to purchase or condemn that property. The modified permit also provides that

> there shall be no construction of project facilities or other site preparation or construction activity, *except as necessary to complete the evaluations, studies, plans and reports required by this permit or the permit issued by the Army Corps of Engineers pursuant to Section 404 of the federal Clean Water Act for the construction of this project*.

Thus, the permit expressly allows "site preparation or construction activity . . . as necessary to complete the [various] evaluations, studies, plans and reports *required by [the VWP permit]*" and the petition, viewed in the light most favorable to CBF, supports an inference that the permit's existence, although not necessary for the exercise of eminent domain, makes the City's use of eminent domain more likely. The language in the petition and the reasonable inferences from that language sufficiently allege the activities allowed by the modified permit will harm the recreational and aesthetic interests of some of CBF's members, who boat, bird watch, fish, and otherwise recreate in the rivers and surrounding areas.

In addition, the documents filed by the City to supplement the petition indicate that the Army Corps of Engineers had rendered a decision that the project would "cause flooding or excavation of 115 [archeological] sites, 79 of which were recommended . . . for further study." The City conceded in argument that it was required to conduct such archeological studies and that the studies would be conducted adjacent to the existing creeks involved in the reservoir project because "[t]he Indians . . . camped next to creeks." It argued, however, that the excavation was separately authorized by a different type of federal permit. As discussed supra in Part II.A.2 and 3, although the City may have been *authorized* to excavate even if the specific state and federal reservoir permits were not extended or renewed, the nonrenewal of the VWP permit would decrease the likelihood that the City would conduct such excavations, and therefore, nonrenewal would provide some measure of protection for the recreational and aesthetic interests of CBF's members who boat, bird watch, fish, and otherwise recreate in the rivers and surrounding areas to be affected by activity authorized by the modified permit.

Thus, the petition and related exhibits also permit the inference of an allegation that the studies required by the VWP permit and the archeological excavating required by the federal permit and allowed by the VWP permit pose a concrete, imminent harm that is both causally related to issuance of the VWP permit and likely to be redressed by the nonrenewal of the permit.

(2) and (3)  Nature of Interests and Requested Relief

Appellees do not expressly challenge parts (b) and (c) of the representational standing test, which require that "(b) the interests [the organization] seeks to protect are germane to [its] purpose[] and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Stumpy Lake, 46 Va. App. at 114, 616 S.E.2d at 44

(quoting <u>Hunt</u>, 432 U.S. at 343, 97 S. Ct. at 2241, 53 L. Ed. 2d at 394).  We hold that the facts alleged satisfy all prongs of the test for representational standing.

Thus, we conclude that CBF has alleged sufficient facts to establish standing to sue in a representational capacity.

III.

For these reasons, we hold the facts alleged in CBF's petition for appeal, accepted as true, were sufficient to survive the appellees' demurrers.  Thus, we reverse the trial court's dismissal of the petition, and we remand to the trial court for further proceedings consistent with this opinion.

<u>Reversed and remanded.</u>